### CHATTANOOGA, R. & C. R. CO. et al. v. EVANS.

(Circuit Court of Appeals, Sixth Circuit. April 2, 1895.)

#### No. 203.

1. RAILROAD COMPANIES—POWER TO SELL ROAD — STATE STATUTES CONCERNING FOREIGN CORPORATIONS.

    A state statute, declaring it unlawful for any foreign corporation to own or acquire property in the state, or do any business there, without first filing a copy of its charter in the office of the secretary of state, and

an abstract thereof in each county in which it desires to do business (Act Tenn. March 26, 1891), does not take it out of the power of a railroad company previously owning property, and authorized to do business in the state, to make a valid sale of all such property, without first complying with the provisions of the statute.

2. SAME—RIGHT OF FOREIGN RAILROAD COMPANY TO DO BUSINESS IN A STATE.
The Tennessee statute of March 23, 1887, by its first section, authorized foreign railroad companies to extend their roads into the state a distance not exceeding five miles, for the purpose of reaching a terminal point or depot. The second section authorized such corporations to acquire a right of way to such terminal point by purchase, gift, or condemnation. Section 3 gave them power to purchase real estate necessary for the erection of depots, shops, yards, etc., and concluded with the proviso that "they shall first apply for and receive a charter in this state." *Held*, that the proviso should be construed as applying only to the section in which it was found, and that a railroad company was authorized under the previous sections to acquire a right of way, and construct its road thereon, without first securing a charter from the state.

3. SAME.
A statute declaring it unlawful for any foreign corporation to acquire property in the state, without first complying with certain prescribed conditions, and declaring a penalty against any one violating this provision (Act Tenn. March 26, 1891), does not invalidate a purchase made without compliance therewith, but merely subjects the offender to the punishment prescribed.

4. CORPORATIONS—INSOLVENCY—POWER TO SELL ASSETS—RIGHTS OF CREDITORS.
The property of a corporation is not a trust fund for its creditors in any such sense that its mere insolvency, while still a going concern, will prevent it from making a bona fide sale of all its property, which will be valid as against mere contract creditors.

5. RAILROAD COMPANIES—LIEN FOR LABOR AND MATERIALS.
The Tennessee statute of 1877, providing, among other things, that no railroad company shall have power to create any lien on its property which shall be valid as against judgments and decrees "for timber furnished and work and labor done on, or for damage to persons and property in the operation of, its railroad in this state," does not include material furnished and work done in the creditor's machine shops upon locomotives; or railroad supplies, such as tools, spikes, hardware, etc.; or damages resulting from detention of freight shipped over the line, unless such damage was occasioned by an actual injury to the property, and unless the same occurred within the state.

6. SAME.
The above statute does not apply to a bona fide sale of the railroad property, as distinguished from an attempt to create a lien thereon.

7. SAME—SALE IN FRAUD OF CREDITORS.
A sale of the entire property of an insolvent railroad company, under an arrangement whereby the entire purchase price is distributed among the stockholders, is fraudulent and void, as against unsecured creditors, when such creditors are known to exist by both parties to the sale.

8. SAME—KNOWLEDGE OF GRANTEE.
A corporation which purchases all the property of a railroad company, knowing that such company is insolvent, under an arrangement by which a large part of the purchase price will be placed beyond the reach of creditors, if there are any, is under a duty to inquire as to the existence of unsecured creditors, and is chargeable with all knowledge which such an inquiry would disclose.

9. SAME—RIGHTS OF UNSECURED CREDITORS.
An insolvent railroad company sold its entire property to another railroad company for bonds of the latter company, which were guarantied by a banking corporation. The contract of sale provided that the larger part of these bonds should be distributed to holders of stock and income bonds of the selling company, and that, in consideration for the guaranty, the

said stock and income bonds were to be delivered to the banking corporation, and held as its property. *Held* that, as against unsecured creditors of the selling company, the income bonds must be considered as paid and canceled.

10. REPLEVIN OF ATTACHED PROPERTY—REPLEVIN BOND—LIABILITY OF SURETIES,

Under the Tennessee statute (Mill. & V. Code, § 4250), the defendant, in an attachment suit, is authorized to replevy the property upon giving bond, either in double the amount of plaintiff's demand, conditioned to pay the same, or in double the value of the property attached, conditioned to pay such value, in the event of being cast in the suit. *Held*, that where a bond was given which did not clearly show whether it was given for double the amount of the demand or double the value of the property, but which was conditioned "to be satisfied by delivery of the property or its value," the condition as thus expressed must control, and a personal decree for the amount of the recovery could not be entered against the sureties.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

This was a bill by H. Clay Evans against the Chattanooga, Rome & Columbus Railroad Company and others, to subject certain railroad property to the payment of a judgment. The circuit court found in favor of the complainant's claim, and, the property having been attached and then replevied by defendants, a decree was pronounced against all the parties to the replevin bond, from which decree they have appealed.

The Chattanooga, Rome & Columbus Railroad Company is a corporation of the state of Georgia. Its road was constructed in 1887, and included about 157 miles of railroad, extending from Carrolton, in the state of Georgia, to Chattanooga, in the state of Tennessee. Only about five miles of its entire line is within the state of Tennessee, the remainder being within the state of Georgia. The Savannah & Western Railroad Company is another Georgia corporation, owning and operating a line of railroad in that state. In May, 1891, the first-named railroad sold and conveyed its entire line of railroad, and all of its equipments and assets of every kind, to the latter company. This sale by the one company to the other was fully authorized by the charter of each of the contracting companies. The complainant Evans is a judgment creditor of the selling company, with an execution returned nulla bona. His original bill was filed in the Tennessee chancery court, for the purpose of subjecting so much of the property of the Chattanooga, Rome & Columbus Railroad Company as was situated within the state of Tennessee. The entire property of the selling company was at the time of sale subject to two mortgages, the Central Trust Company of New York being the trustee in each. The first mortgage was to secure 2,240 5 per cent. gold bonds, of the denomination of $1,000 each; and the second included the same property, as well as the income of the mortgagor company. This latter mortgage was to secure "income bonds," aggregating $1,400,000. Both these mortgages had been duly executed before Evans became a creditor. The object of his bill was to subject the Tennessee property to the satisfaction of his debt, notwithstanding these mortgages and the conveyance of the equity of redemption to the Savannah & Western Railroad Company. His contention, briefly stated, was as follows: (1) That his judgment was for work and labor done on the property of the Chattanooga, Rome & Columbus Railroad, and that under the statute law of the state no mortgage made by a railroad in that state was valid as against an execution upon such a judgment. (2) That both the selling and buying railroad companies were nonresidents of the state of Tennessee; that neither was incorporated under the law of Tennessee, and neither was authorized to buy, sell, own, or operate a railroad in that state, neither having registered its charter as required by the law of that state; that the deed made by the debtor company was absolutely void for noncompliance with the requisite conditions authorizing nonresident corpora-

tions to do business in that state. (3) That the sale to the Savannah & Western Railroad Company was made with the purpose and intent of hindering, delaying, and defrauding the general creditors of the selling company, and that this purpose was known and participated in by the buying corporation. (4) That the selling company was wholly insolvent at the time of the sale, and that its property was therefore a trust fund for the equal benefit of all its creditors, and that a sale which deprived it of all its assets, and made no provision for its general creditors, was fraudulent in law and fact. Evans' bill was filed for the benefit of himself and all other creditors who might choose to intervene and become parties. An attachment was prayed and granted, which was levied, not only on the railroad situated within the state, but upon locomotive engines, cars, machinery, tools, office furniture, etc., found within the jurisdiction. The property thus attached was replevied, under a provision found in the Tennessee Code, by the purchasing company and its lessee, the Richmond & Danville Railroad Company, and by the Central Trust Company, trustee, under the two mortgages heretofore mentioned. Subsequently the suit was removed from the state court into the United States circuit court for the Eastern district of Tennessee by two of the defendant corporations. Upon a final hearing the circuit court held that the attached property was subject to the claim of Evans, as well as to the claims of two other creditors who had become parties by intervention, and a decree was pronounced against all the parties to the replevin bonds for the full amount of the claims adjudged. From this decree all the defendants have appealed and assigned errors.

J. H. Barr and Alex. C. King, for appellants.

R. P. Woodward, Clark & Brown, and Charles R. Evans, for appellees.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after stating the foregoing facts, delivered the opinion of the court.

The decree of the circuit court seems to have been rested upon two propositions: First. That the sale and transfer of the Chattanooga, Rome & Columbus Railroad Company was fraudulent and void as to the creditors of that company, and the property conveyed subject to attachment. Second. That the obligation of the several replevy bonds executed to secure the discharge of the attached property from the custody of the court was such that the obligors therein were absolutely liable for the amount of the claim of each attaching creditor, and that this liability could not be discharged by the return of the replevied property. Those bonds were conditioned to pay off the claims of the several attaching creditors, or return the replevied property to the custody of the court, in case it should be determined that the property for which these bonds were a substitute should be held subject to attachment. Entertaining the opinion that the liability of the obligors in those bonds may be discharged by the performance of either alternative, it has become necessary to determine the rights of the appellees in case the property shall be returned. This involves a series of difficult and important questions, which will be considered in the following order: (1) Was the deed of May 1, 1891, conveying all the assets of the Chattanooga, Rome & Columbus Railroad Company, so obnoxious to the statute law of Tennessee concerning foreign corporations as to be absolutely void, for any

and all purposes? (2) Have the complainants, by reason of the character of their several claims, any such equity or lien as entitles them to a preference over the two mortgages mentioned, or to follow the corporate property into the hands of a bona fide purchaser for value? (3) Was the deed of May 1, 1891, voidable for fraud by the creditors of the grantor corporation?

First. What is the effect of the Tennessee statute of March 26, 1891, upon the conveyance of May 1, 1891, to the Savannah & Western Railroad Company? The insistence of appellees is that the deed then made by the Chattanooga, Rome & Columbus Railroad Company is absolutely void as to so much of said road as was within the state of Tennessee, and that the title to the Tennessee portion remained in the grantor company. The second and third sections of that act are as follows:

"Sec. 2. Be it further enacted, that each and every corporation created or organized under or by virtue of any government other than the state, for any purpose whatever, desiring to own property or carry on business in this state of any kind or character, shall first file in the office of the secretary of state a copy of its charter, and cause an abstract of same to be recorded in the office of the register in each county in which the corporation desires to carry on its business or to acquire or own property, as now required by section 2, of chapter 31, of Acts of 1877.

"Sec. 3. Be it further enacted, that it shall be unlawful for any foreign corporation to do or attempt to do any business or to own or acquire any property in this state without having first complied with the provisions of this act; and a violation of this statute shall subject the offender to a fine of not less than $100 or more than $500, at the discretion of the jury trying the case."

That the grantor company was lawfully doing business in the state, and had power to convey to one capable of acceptance, is not seriously resisted. It had acquired by gift or grant a right of way, and had constructed and operated its road for several years before the passage of the act of 1891. When that act was passed it certainly had the option to abandon business in the state, or, by complying with its requirement, obtain the necessary authority to continue doing business. If not permitted to "own or acquire any property," it was clearly not the intent to prohibit a sale of that which it lawfully had, especially if made for the purpose of discontinuing business. Such a construction would operate to deprive the corporation of its property without due process of law, and would be a practical confiscation. That it was lawfully in the state was clearly recognized by the act of March 14, 1890, which recognizes it as a Georgia corporation owning and operating a railroad from Chattanooga to the Georgia state line, and empowered the city of Chattanooga to ratify a subscription to its corporate stock theretofore irregularly made, on condition that the amount thereof should be expended within the city in acquiring depot facilities, shops, etc. Independently of this, we think that the state had licensed the construction of this road by the act of March 23, 1887. That act reads thus:

"Section 1. Be it enacted by the general assembly of the state of Tennessee, that any railroad corporation created by the laws of any other state, shall be authorized and empowered to extend its railroad into this state a distance of not exceeding five miles from the point of its entrance into this state, for

the purpose of reaching a terminal point, or a general or a union depot, in or in the vicinity of any city, town, or village in this state.

"Sec. 2. Be it further enacted, that such corporations may acquire the right of way for their railroads from the line of this state to their terminal points or depots, in this state, by purchase, or by gift, or by condemnation, according to the laws of this state, as provided in sections 1550–1573, inclusive, of the Code of Tennessee (Milliken & Vertrees).

"Sec. 3. Be it further enacted, that such corporation shall have the power and right to purchase, hold, use, and enjoy all real estate necessary for the erection and maintenance of their depots, shops, yards, sidetracks, turnouts, and switches, both along the route and at their terminal points in this state: provided, they shall first apply for and receive a charter in this state."

The proviso appended to the third section should be limited to the powers granted by that section. To apply it to the two first sections would be repugnant to their purpose and intent, and such a construction would be inadmissible, unless no other construction was possible. Savings Bank v. U. S., 19 Wall. 227–236. A proviso to a particular section does not apply to others, unless plainly intended. Suth. St. Const. § 223; U. S. v. Babbit, 1 Black, 55. The grantor corporation had acquired a mere right of way, and seems to have owned no depot or yard or shops or other terminal facilities at Chattanooga. But it is argued that, if it be conceded that the grantor had power to convey, the grantee had no power to take, own, or acquire, not having complied with the provisions of the act of 1891. That a state has the right to prescribe terms upon which a corporation of another state or country may carry on business within its borders is well settled. Bank v. Earle, 13 Pet. 519; Insurance Co. v. French, 18 How. 404; Paul v. Virginia, 8 Wall. 168; Ducat v. Chicago, 10 Wall. 410; Fritts v. Palmer, 132 U. S. 282, 10 Sup. Ct. 93. That there are limitations upon this power is equally well settled, for it cannot impose as a condition that such nonresident corporation shall not resort to the courts of the United States. Insurance Co. v. Morse, 20 Wall. 445; Barron v. Burnside, 121 U. S. 186, 7 Sup. Ct. 931. Neither would a statute be valid which imposed any condition conflicting with the constitution or laws of the United States. A limitation upon the right of a corporation of another state to carry on commerce between the states would be an infringement upon the exclusive control of congress over commerce among the states. Paul v. Virginia, 8 Wall. 168; Manufacturing Co. v. Ferguson, 113 U. S. 734, 5 Sup. Ct. 739. The agreed statement of facts upon which this case was heard sets out that "the only business that was done by the C., R. & C. R. R. Co. within the state, and that done by the Savannah & Western R. R. Co. after its purchase of said road, and by the Richmond & Danville R. R. Co. in operating said road, was that of interstate commerce or traffic, consisting in the carrying of passengers, baggage, freights, and the United States mails from the state of Georgia and other states into the state of Tennessee, and vice versa." It has been earnestly argued that any law of the state imposing any conditions, not strictly of a police character, upon a nonresident corporation, engaged exclusively in interstate commerce, by which it was prohibited from acquiring the necessary facilities to conduct such commerce, would

be inhibited as an interference with interstate commerce. We do not think it necessary to determine this question, being of opinion that the conveyance of this road to the grantee company was operative to pass such title as the grantor company had. The Tennessee act does undoubtedly make unlawful the acquisition of property within the state by any nonresident corporation until it first acquires the right to do business in that state in the mode prescribed by the local law. Assuming, therefore, that when the Savannah & Western Railroad Company acquired this property it violated the law of the state, yet it does not follow that the title remained in the grantor company notwithstanding its conveyance. Neither does it follow that the grantor, or its assignee or creditors, could institute a proceeding to recover the title. The Tennessee statute subjects the corporation violating the statute to a fine. It nowhere declares that the conveyance by which the offending corporation acquired the property shall be inoperative to pass the title out of the grantor. The prohibition upon the acquisition of property found in this statute is substantially the same as that in a Colorado statute construed in Fritts v. Palmer, 132 U. S. 282–289, 10 Sup. Ct. 93. The suit in that case was by a subsequent grantee, who took a quitclaim deed after his grantor had made deed to a nonresident corporation. The Colorado statute prohibited the acquirement of real estate within the state by any nonresident corporation until it had first acquired the right to do business in the state in the mode prescribed by the statute. It did not declare that titles taken in violation of the law should be wholly and absolutely void, nor that the title should remain in the grantor. It did, however, impose a severe penalty for its violation. The court held that the title passed by the deed to the corporation, and could not be recovered by the grantor or one standing in his shoes, saying:

"The fair implication is that, in the judgment of the legislature of Colorado, this penalty was ample to effect the object of the statutes prescribing the terms upon which foreign corporations might do business in that state. It is not for the judiciary, at the instance or for the benefit of private parties, claiming under deeds executed by the person who had previously conveyed to the corporation, according to the forms prescribed for passing title to real estate, to inflict the additional harsh penalty of forfeiting, for the benefit of such parties, the estate thus conveyed to the corporation and by it conveyed to others. If Groshon, the grantor of the Comstock Mining Company, had himself brought this action, the injustice of his claim would be conceded. But the present plaintiff, who asserts title under a quitclaim deed from Groshon made after the property had passed, by the sale under the deed of trust, from the mining company, cannot, in law, occupy any better position than the original grantor would have done if he had himself brought this action. If the legislature had intended to declare that no title should pass under a conveyance to a foreign corporation purchasing real estate before it acquires the right to engage in business in the state, and that such a conveyance should be an absolute nullity as between the grantor and grantee, leaving the grantor to deal with the property as if he had never sold it, that intention would have been clearly manifested."

This case was followed in Seymour v. Gold Mines, 153 U. S. 523, 14 Sup. Ct. 847. The principle upon which these cases rest has been repeatedly announced by the supreme court. Smith v.

Sheeley, 12 Wall. 358; Bank v. Matthews, 98 U. S. 627; Bank v. Whitney, 103 U. S. 103; Swope v. Leffingwell, 105 U. S. 3; Reynolds v. Bank, 112 U. S. 412, 5 Sup. Ct. 213. The construction we have adopted finds support in Mill Co. v. Bartlett (N. D.) 54 N. W. 544; Carlow v. C. Aultman & Co., 28 Neb. 672, 44 N. W. 873; Fisk v. Patton, 7 Utah, 399, 27 Pac. 1; Wright v. Lee (S. D.) 51 N. W. 706; 55 N. W. 931. It is based upon the abhorrence which equity has of the harshness of a construction, uncalled for by any express requirement of the statute, which would operate to effect a forfeiture. That the state only can take advantage of the want of capacity in a corporation to take and hold land is well settled. Barrow v. Turnpike Co., 9 Humph. 303; Runyan v. Coster's Lessee, 14 Pet. 122–131; Davis v. Railroad Co., 131 Mass. 273; Mor. Priv. Corp. § 665; Jones v. Habersham, 107 U. S. 181, 2 Sup. Ct. 336; Hickory Farm Oil Co. v. Buffalo, etc., R. Co., 32 Fed. 22; Heiskell v. Lodge, 87 Tenn. 668, 11 S. W. 825. In the case last cited the court recognized the obvious distinction between a contract executed and one executory, saying:

"There is a distinction between the case where a corporation has received and is holding property in excess of the limitations in its charter and the case where its rights have not vested and it is not in possession. In the first case no one but the state can raise the question or enforce a forfeiture."

The case of Lumber Co. v. Thomas, 92 Tenn. 593, 22 S. W. 743, is supposed by counsel for appellees to be in antagonism with the view we have indicated as to the effect of the act of 1891 upon the deed in question here. We do not concur in this view. That was a suit by a nonresident corporation doing business in the state without having complied with the act. The court refused to aid the plaintiff or to enforce the contract into which it had entered. It is true that the court did use some very broad language in regard to contracts by such corporations who had not complied with the local law. But what was there said was in regard to an effort to obtain the affirmative aid of the court in the enforcement of a contract prohibited by the statute. A very broad distinction exists between an executed and an executory agreement. The statute has declared no forfeiture, and we are not disposed to aid in bringing about so inequitable a result. "A court of equity is always reluctant in the last degree to make a decree which will effect a forfeiture." Bank v. Matthews, 98 U. S. 621.

Second. The mere fact of insolvency did not operate to fasten any such specific lien upon the property of the Chattanooga, Rome & Columbus Railroad Company as to enable general and unsecured creditors to follow the property into the hands of preferred creditors to whom it was assigned. For a stronger reason, such creditors cannot reach corporate assets conveyed to a bona fide purchaser. The Chattanooga, Rome & Columbus Railroad Company was embarrassed, and its debts exceeded its assets; but it was a going corporation, and might bona fide assign its property for the benefit of preferred creditors, or make a sale to a purchaser in good faith and for value. Whatever a natural person might do an embarrassed but going corporation could do, unless prevented by some

provision of its charter or inhibition found in the local law of the state. Neither will a condition of insolvency prevent the creditors of a going corporation from securing priority by attachment or levy of execution or other due course of law. First Nat. Bank v. North Alabama Lumber & Manuf'g Co., 91 Tenn. 12, 18 S. W. 400. In case of an absolute sale of all the property of an embarrassed corporation, the purchase price, with respect to creditors, will stand as a substitute for the property conveyed, and the creditors' rights may be enforced against that price. Mor. Priv. Corp. §§ 784, 789, 791; First Nat. Bank v. North Alabama Lumber & Manuf'g Co., 91 Tenn. 12, 18 S. W. 400.

It is as true in regard to a corporation as it is in the case of a natural person that any transfer of its property without authority of law and in fraud of existing creditors is void as against them. But a simple contract creditor has no such lien upon the property of an embarrassed corporation as will enable him to set aside an assignment or a sale made in good faith and in accordance with law. There is a sense in which it is often said that the property of a corporation is held in trust for the payment of its debts. But no direct trust or lien attaches to the property of a corporation in favor of its simple contract creditors. Speaking of the doctrine sought to be invoked here, Mr. Justice Field, in Fogg v. Blair, 133 U. S. 541, 10 Sup. Ct. 338, said:

"That doctrine only means that the property must first be appropriated to the payment of the debts of the company, before any portion can be distributed to the stockholders. It does not mean that the property is so affected by the indebtedness of the company that it cannot be sold, transferred, or mortgaged to bona fide purchasers for a valuable consideration, except subject to the liability of being appropriated to pay that indebtedness. Such a doctrine has no existence."

In respect to the same doctrine, Mr. Justice Brewer, in the later case of Hollins v. Iron Co., said:

"The same idea of equitable lien and trust exists to some extent in the case of partnership property. Whenever a partnership becoming insolvent, a court of equity takes possession of its property, it recognizes the fact that in equity the partnership creditors have a right to payment out of those funds in preference to individual creditors, as well as superior to any claims of the partners themselves. And the partnership property is therefore sometimes said, not inaptly, to be held in trust for the partnership creditors, or that they have an equitable lien on such property; yet all that is meant by such expressions is the existence of an equitable right which will be enforced whenever a court of equity, at the instance of a proper party, and in a proper proceeding, has taken possession of the assets. It is never understood that there is a specific lien or a direct trust." 150 U. S. 385, 14 Sup. Ct. 127.

The insistence of the appellees that their claims constituted a lien upon the property of the grantor company superior to the lien of the mortgages, though the latter were prior in time to the origin of their several debts, and superior to the deed of sale, is based upon a provision found in an act of the general assembly of Tennessee passed in 1877. The section of that act which bears upon the question in hand is in these words:

"That no railroad company shall have power under this act, or any of the laws of this state, to give or create any mortgage or other kind of lien on its railroad property in this state, which shall be valid and binding against

judgments and decrees and executions therefrom, for timbers furnished and work and labor done on, or for damages done to persons and property in the operation of, its railroad in this state."

The Tennessee supreme court has construed this act as operating as a limitation upon the power of railroad companies to give a mortgage or create a lien upon their property situated in the state, which should be valid as against claims of the character mentioned in the act. Frazier v. Railway Co., 88 Tenn. 138, 12 S. W. 537. Such claims do not constitute liens by virtue of the act. The act has no other effect than to postpone mortgages and other liens created by act of the railroad company to claims of the character mentioned. A bona fide sale would not be a mortgage or lien, within the terms of the act, and the title of such a purchaser would be unaffected by the act. If the Savannah & Western is a bona fide purchaser, it may set up the deed under which it holds as an answer to a claim, though clearly within the preferential class defined by the statute. We are, however, of opinion that none of the claims asserted by appellees are entitled to the benefit of this provision. The claim of Evans is for material furnished and work and labor done in his machine shops upon locomotive engines. The act only refers to work and labor done "on" the railroad in Tennessee. Work done on an engine may be work done for a railroad, but is not work and labor done "on" the railroad. The claim of James & Co. is for general railroad supplies, such as tools, spikes, hardware, etc. The act does not prefer any claim for materials other than "timbers furnished." The claim of Kratzenstein was for damages in detention of freight shipped over its line of railway. There is no evidence as to the character of the damages sustained. If the goods perished or were injured in transit through this state, Kratzenstein would seem to be within the saving of the statute, as having a claim for "damages done * * * to property in this state." There are two objections to this claim: First. It is not shown that Kratzenstein's property was damaged in the operation of the railway. If his loss was not due to an actual injury to his property, then he has not made out a case of "injury to property," within the meaning of the act of 1877. Second. It is not shown that any injury was done his property in the operation of the road within this state. If his damages were sustained at some point on the line, but in another state, the claim is not within the act. Kratzenstein alleges that his loss was "for a delay at Chattanooga." The answer only admits that his judgment was for damages for "detention on some part of its line of railroad." There is no evidence as to where he sustained his loss, or as to whether his damages were to the goods in shipment, or for a decline in the market, or loss of a profitable contract by reason of delay. One who seeks to avail himself of a proviso limiting the operation of a general power must bring himself clearly within the exception. For the reasons stated, none of the claims of appellees are entitled to preference over the mortgages, by reason of anything in the statute above cited. All other questions aside, the mortgages would be entitled to be first satisfied, and only the

surplus could be subjected by creditors of the class to which appellees belong.

Third. This brings us to the question of the bona fides of the conveyance of May 1, 1891. As we have already stated, that sale included every particle of the tangible property of the debtor corporation. If that sale was made in good faith and for a valuable consideration, the creditors unprovided for, and, having no liens, are without recourse, and no other decree would be admissible than one reversing the decree of the circuit court and dismissing the bill. The consideration for the sale, as stated in the deed, was substantially as follows:

(1) The assumption by the Savannah & Western Railroad Company of the principal and interest of the 2,240 first mortgage gold bonds, secured by the trust deed of September 1, 1887, to the Central Trust Company of New York, said bonds being of the denomination of $1,000 each.

(2) A covenant by which the purchasing company agreed

—"To pay or cause to be paid to the said party of the first part the sum of four hundred thousand dollars ($400,000) of the first consolidated mortgage bonds of the said party of the second part, duly guarantied by the Central Railroad & Banking Company of Georgia, the same to be paid to the said party of the first part by and through the said the Central Railroad & Banking Company of Georgia, for the use and benefit of the holders of the income bonds and of the stock of the said party of the first part. Two hundred and ninety-five thousand dollars ($295,000) of which said bonds are acknowledged to have been paid to and for the holders of the three-fourths (¾) of said stock and income bonds, which have been delivered and transferred in accordance with the terms of this indenture to the said the Central Railroad & Banking Company of Georgia, the receipts of which said two hundred and ninety-five thousand dollars ($295,000) of said bonds is hereby acknowledged, and the remaining one hundred and five thousand dollars ($105,000) of said Savannah & Western bonds as follows: Three (3) of said first consolidated mortgage bonds to be paid upon delivery to the said Central Railroad & Banking Company of Georgia of twenty of said income bonds, or upon the delivery of four hundred (400) shares of said stock, which said income bonds and stock it is expressly agreed by the said party of the first part shall be delivered, assigned, and transferred to said the Central Railroad & Banking Company of Georgia, and become and be held by it as its property, with all the rights of any other income bond or stock holder, except the right to demand or receive any part of said Savannah & Western consolidated first mortgage bonds in consideration for the guaranty placed by the said the Central Railroad & Banking Company of Georgia upon the said Savannah & Western consolidated first mortgage bonds, and the receipt or receipts of any holder of any of said income bonds or stock of said party of the first part presenting the same to the said Central Railroad & Banking Company of Georgia shall be a full and sufficient voucher and evidence of payment of such portion of said Savannah & Western first mortgage bonds as may have been delivered to such bond or stock holder, and as such a full and sufficient receipt, evidencing the payment of so much of the purchase price above covenanted to be paid. The said party of the second part in no way obligates or binds itself to pay either the principal or the interest of the income bond issued by said party of the first part, dated September 2, 1887, and secured by a deed of trust to the Central Trust Company of New York, except as hereinbefore provided; and said deed of trust is to have no other or further operation than such lien as it may have by the operation of such deed to secure the principal of said bonds subordinate to the lien of said first mortgage hereinbefore set out; and the said party of the first part, for itself and its successors, doth hereby covenant that it hath good and sufficient title to the railroad property, rights, and franchises herein and hereby conveyed, and the right to convey the same, and that the same are unincum-

bered save as herein specified, and that it and its successors will and do by these presents warrant and defend the same, and every part thereof, to the said party of the second part, its successors and assigns, against the claims of all persons whatsoever; and the said party of the first part, for itself, its successors and assigns, doth hereby covenant, grant, and agree to and with said party of the second part, its successors and assigns, that said party of the first part, its successors and assigns, shall and will at any time, and from time to time hereafter, upon request make, do, execute, and deliver all such further and other acts, deeds, and things as shall be reasonably advised, devised, or required to effectuate the intention of these presents to secure and confirm to the said party of the second part, its successors or assigns, all and singular, the property and estate, real and personal, and rights, privileges, and franchises hereinbefore described and intended to be granted, and so as to render the same, and all portions thereof, available to the said party of the second part, according to the intent and purposes herein expressed."

In aid of the interpretation of this deed, the resolution of the board of directors of the selling company was introduced as evidence. That resolution was in these words:

"Mr. W. W. Brooks offered the following resolution: 'Resolved, that this company will sell to the Savannah & Western Railroad Company its railroad, including all branches, rolling stock, depot facilities, and all property of every character, its rights and franchises, and assign, transfer, and set over to it its contracts with the United States Express Company, the Western Union Telegraph Company, the Southern Railway News Company, the Cincinnati, New Orleans & Texas Pacific Railway Company, and all other contracts for building side tracks, for shipping ores or other commodities, or which bind any persons to furnish freight, lands, or facilities of any kind to the Chattanooga, Rome & Columbus Railroad Company, for four hundred thousand dollars ($400,-000) of the Savannah & Western Railroad Company first consolidated mortgage bonds, guarantied by the Central Railroad & Banking Company of Georgia, to be paid out to the holders of the income bonds and stock of the Chattanooga, Rome & Columbus Railroad Company, at the rate of three (3) Savannah & Western bonds for twenty (20) income bonds or four hundred (400) shares of stock, said income bonds and stock not to be extinguished, but to become the property, with all the rights now existing, of the Central Railroad & Banking Company of Georgia, in consideration of the guaranty on said Savannah & Western Railroad Company bonds. Said Savannah & Western Railroad Company also to assume the payment of the principal and interest of the first mortgage bonds of this company, and the president and secretary are hereby authorized to execute and deliver an agreement to sell said stock, property, and franchises; also a deed, with covenants of warranty, to the said the Savannah & Western Railroad Company, conveying to it the above railroad property, rights, contracts, and franchises,'—which resolution was unanimously adopted."

The answer of the respondent companies alleged that, as a part consideration, the said Savannah & Western Railroad Company paid off the said income or second mortgage bonds. There was no other material proof as to the consideration paid or to be paid than afforded by the deed and resolution above recited. It may be that, as between the Savannah & Western and the Chattanooga, Rome & Columbus Railroad Companies, there was some secret trust or. unexplained arrangement by which, as between them, the income bonds were to be regarded as paid. The answer, in which both of those corporations join, asserts that the payment of the income bonds was a part of the consideration for the sale. However this may be,—and as to this no evidence was offered,—the deed does not bear out the answer; for it is therein expressly recited that the $400,000 of the consolidated bonds of the Savannah & Western were to be paid "by and through the said Central," etc.,

"for the use and benefit of the holders of the income bonds and of the stock of the said party of the first part." The then holders of those bonds and of the shares of stock were to receive the Savannah & Western bonds in exchange upon the terms set out in the deed. The deed further recites that the bonds and stock were to be delivered to the said Central Company, "and become and be held by it as its property, with all the rights of any other income bond or stock holder, except the right to demand or receive any part of said Savannah & Western consolidated first mortgage bonds in consideration of the guaranty placed by the said Central," etc., "upon the said Savannah & Western consolidated first mortgage bonds." The deed further provided that, while the Savannah & Western did not assume or obligate itself to pay either the principal or interest of said bonds, the lien of the second mortgage was to continue. The suggestion that the Savannah & Western bonds, to be delivered in exchange for income bonds and stock, were bonds owned by the Central Company, is not borne out by any fair inference drawn from the deed. The resolution authorizing the sale, provided for a sale to the Savannah & Western upon condition that the purchaser would assume and pay the first mortgage bonds, and upon the further consideration of $400,-000 of its mortgage bonds, to "be paid out to the holders of the income bonds and stock," in the ratio heretofore stated. That resolution also provided that "the income bonds and stock should not be extinguished, but to become the property, with all the rights now existing, of the Central," etc., "in consideration of the guaranty on said Savannah & Western Railway Company's bonds."

If, as suggested, the Central Company bought these bonds and shares with its own property, why make any reference to it at all? If it paid out its own bonds, then that was a good consideration. Yet the directors' resolution and the deed recite that the consideration upon which it was to become the owner of the income bonds and stock was its guaranty of the Savannah & Western bonds to be paid out for them. The single expression of the deed that these Savannah & Western bonds were "to be paid to the party of the first part by and through the Central," etc., does lend some color to the suggestion that the bonds were bonds owned by the Central Company. The transaction is shrouded in mystery, but it was a mystery which could have been fully explained by the parties to the deed. This they have not chosen to do, though the circumstances are clearly such as to call for an explanation. In the light of the evidence afforded by the deed, we can but infer that, as a part consideration for the sale of the entire property of the grantor company, it, "the party of the first part," was to receive $400,000 in the bonds of the buying company. These bonds were to be strengthened by the indorsement of the Central Company, which, as a consideration for this indorsement, was to become the owner of the income bonds and capital stock. This guaranty of the Savannah & Western bonds was an element of value contracted for by the selling corporation, the benefit of which was to inure to the holders of the bonds and stock. Thus the interest and right of

redemption which the selling corporation had in its entire corporate assets were to be transferred for $400,000 of the guarantied bonds of the buying company. These bonds were a corporate asset, and should have been held by the officers and directors of the Chattanooga, Rome & Columbus Railroad Company, as a substitute for the property sold and subject first to the demands of creditors. Instead of this, the contracting parties entered into an arrangement by which every dollar of that purchase price was diverted from creditors, and distributed between those creditors then holding income bonds and its shareholders. This distribution did not operate to pay a dollar of corporate debts. The income bonds, according to the scheme, were to continue obligations of the selling corporation and a lien on its property. It was a matter of no importance to the Chattanooga, Rome & Columbus Railroad Company whether the income bonds should be held by those who then owned them or should become the property of the Central Railroad & Banking Company. In either case, according to the device, they were to remain obligations of the debtor company. The device was doubly fraudulent, in that so much of this price as was not to be used in enabling the Central Company to acquire the income bonds was to be distributed among the shareholders, not for the purpose of extinguishing the shares, but as a consideration inducing the then shareholders to part with their shares to the Central Company. Any device by which the assets of an insolvent corporation are to be parceled out between shareholders, leaving creditors unpaid, is a fraud of which creditors affected may complain. That such creditors may follow the purchase money thus wrongfully paid into the hands of stockholders is very clear. That shareholders have only a right to the surplus, after all debts are paid, is familiar law. Railroad Co. v. Howard, 7 Wall. 392.

Creditors of an insolvent corporation may ignore a sale of corporate property if the transaction was tainted with fraud, and both buyer and seller participated in the fraudulent purpose. The effect of fraud upon an assignment or sale of corporate property is identical with its effect upon a like transaction between natural persons. Vance v. Coke Co., 92 Tenn. 47, 20 S. W. 424, is a case somewhat like this in many of its features. The suggestion that the sale included, not only the corporate property, but the shares of stock, and that as the shares belonged to the shareholders it was not a fraud on creditors that they should receive their just proportion of the gross price to be paid, has absolutely no basis. The shares were manifestly worthless. The price paid for them was really a part of the price paid for the corporate property, and this fact was not even concealed. For their assent to the sale they demanded and received a part of the consideration to be paid for the corporate property.

The case of Railroad Co. v. Howard, heretofore cited, is an interesting and instructive case, in which an arrangement for the sale of the property of an insolvent railroad was negotiated between the bondholders and stockholders, the latter to receive a dividend upon their shares. Unsecured creditors intervened, and obtained

satisfaction of their debts out of the proceeds of sale set apart for the stockholders, notwithstanding an objection was interposed of a like character to that we have here to meet.    In that case, as in this, it was apparent that the price to be paid for stock was really a part of the purchase price of the corporate property.    This brings us to the question as to how far the Savannah & Western Railroad Company was affected by a knowledge of the misapplication of corporate assets intended by the selling corporation.    It may be, for the purposes of this case, conceded that a purchaser of corporate property would not in all cases be chargeable with a participation in the fraudulent misapplication of corporate assets from the mere fact that a part of the purchase price was to be paid to the stockholders, or on their account.    After the payment of debts, the shareholders are entitled to the surplus.    Where a purchaser has no knowledge of the insolvency of a corporation, and there is nothing in the transaction calculated to put him on his guard, he would, in most cases, be perfectly safe in buying, though it appeared that the purchase price, or a part, was to be distributed among the shareholders.    But in the case before us the Savannah & Western Railroad Company knew that it was dealing with an insolvent corporation.    This was manifest from the terms upon which the second mortgage bonds were to be obtained.    It also knew that, although all parties regarded the income bonds as very inadequately secured, yet shareholders were to participate in the distribution of the purchase price, and that the Central Railroad & Banking Company, for some unexplained reason, was to become the owner of the income bonds and shares to be exchanged for its bonds.    It is said that it did not know that the selling company was indebted to creditors other than the mortgage creditors, and that, therefore, it had a right to assume that no fraud was intended by the distribution to be made of the bonds it was to pay as part of the purchase price.    There is no affirmative evidence as to its knowledge or want of knowledge.    The bill directly charged it with having knowledge that the selling corporation owed "a large amount to other creditors," unprovided for.    It answers this in a most vague and unsatisfactory way by denying that the Chattanooga, Rome & Columbus Railroad Company "owed any large amount," or that it had any knowledge thereof.    This method of making an issue upon the adjective "large," instead of fully stating its knowledge or want of knowledge, is most suspicious, and really does not amount to a denial of knowledge.    Again, it did know, and this is fully shown by the circular letter signed by its president, that it was obtaining all the assets of every kind and character which belonged to an insolvent corporation.    With all this knowledge, it entered into an agreement by which a large part of the purchase price, which, as to creditors, was a substitute for the property sold, was to be placed beyond the reach of its creditors, if any it had.    Under such circumstances, we think it was put upon inquiry, and chargeable with knowledge of all such an inquiry would have disclosed concerning the existence of other creditors.    If properly chargeable with the knowledge that there were other creditors unsecured and

unprovided for, then it must be taken to have participated in the fraudulent designs and purposes of the grantor. The decree of the circuit court upon this point must be affirmed. ·

This brings us to the question of the decree which should be rendered. But for the fact that the property attached has been replevied, under sections 4250 and 4255 of the Revised Statutes of Tennessee, by Milliken & Vertrees, there would be little difficulty. The complainants could sell only such interest as the debtor company had in the property attached. That would be its right or equity of redemption in so much of the property as was attached subject to the two outstanding mortgages. The second mortgage, on the facts we have stated, should be regarded as satisfied as to attacking creditors, in so far as the bonds thereunder secured are still held by the Central Railroad & Banking Company of Georgia, or by one not a purchaser for value and without notice. The circumstances under which it obtained the income bonds are such as should estop it from setting them up as unpaid subsisting obligations as against complainants. The assets of the Chattanooga, Rome & Columbus Railroad Company having been used in obtaining them, they should be treated as canceled obligations, as between .it and other creditors of the debtor company. Before this cause was removed from the state chancery court, the Savannah & Western Railroad Company, the Central Railroad & Banking Company of Georgia, the Richmond & Danville Railroad Company, and the Central Trust Company of New York joined in the execution of a bond in order to avail themselves of the privilege extended by section 4250, Revision of Milliken & Vertrees. That section reads as follows:

"4250. The defendant to an attachment suit may always replevy the property attached by giving bond, with good security, payable to the plaintiff, in double the amount of the plaintiff's demands, or at defendant's option, in double the value of the property attached, conditioned to pay the debt, interest and costs, or the value of the property attached, with interest, as the case may be, in the event he shall be cast in the suit."

Section 4255 is in these words:

"4255. The court may enter up judgment or decree upon the bond, in the event of recovery by the plaintiff, against the defendant and his sureties for the penalty of the bond, to be satisfied by delivery of the property or its value, or payment of the recovery, as the case may be."

The bond executed to the complainant Evans, a like bond having been executed to other attaching. creditors who became parties by intervention, was in these words:

"State of Tennessee, Chancery Court of Hamilton County.

"Know all men by these presents, that we, the Savannah & Western Railroad Company, the Central Railroad & Banking Company of Georgia, the Richmond & Danville Railroad Company, the Central Trust Company, principals, and A. N. Sloan, C. A. Lyerly, and Barry & McAdoo, sureties, are held and firmly bound unto H. Clay Evans in the sum of nine thousand dollars, to the payment of which, well and truly to be made and done, we bind ourselves jointly and severally, our heirs, executors, and administrators, firmly by these presents. Sealed with our seals and dated this 20th day of January, one thousand eight hundred and ninety-two. The condition of the

above obligation is such that whereas, on the 18th day of January, 1892, the sheriff of Hamilton county, Tennessee, levied an attachment issued by the chancery court of Hamilton county at suit of complainant in the above-named suit upon the following property described as in the return of said writ, to wit: On the line of railway, side tracks, terminal facilities, depot grounds, shops, and rights of way of Chattanooga, Rome & Columbus Railway, or of the S. & W. Railway, extending from Chattanooga, Tennessee, on the line between the state of Georgia and Tennessee; also the following: One ticket case, 2 folding desks, 1 rule bill, 1 stove, 1 letter press and stand in the office of the R. & D. R. R. Co. at 830 Broad St., Chattanooga; also engine or locomotive marked 'C., R. & C. R. R., No. 2'; Engine No. 1,564, Engine No. 1,442, both of which engines are engines formerly marked 'C., R. & C. R. R.'; also coaches 1,176 and 1,177, formerly marked 'C., R. & C. R. R. Co.'; also all the bolts, fixtures, tools, and machinery in the old C., R. & C. R. R. shops, located just north of Montgomery Ave., Chattanooga, Tenn. And whereas, said property so levied on has this day been replevied, and same delivered to said principal obligors: Now, if said principal obligors herein shall pay the debt, interest, and costs of complainant, if the court shall adjudge the same against them or either of them, or shall adjudge the property attached and herein replevied is subject to the payment of same, they shall either pay said debt, interest, and costs or return said property, then this obligation shall be void and of no effect; otherwise to remain in full force and effect."

The circuit court rendered a decree against each bond thus executed for the amount of the debt of the creditor or creditors to whom it was executed, and did not direct that the decree might be discharged by a return of the property attached. This is assigned as error, inasmuch as the bonds provide that the obligors shall "either pay said debt or return said property." The statutory provisions above set out have been construed by the Tennessee supreme court as operating to discharge the property from the lien of the attachment and from the custody of the court, and rendering it subject to levy of other attachments or executions, and that the bond is substituted for the property replevied. Barry v. Frayser, 10 Heisk. 217. These provisions have been construed as providing for two distinct classes of bonds. In the case cited above, Judge Freeman, for the court, in construing the liability of the obligors upon such bonds, said:

"By the first section, though it is not very clearly expressed, the defendant has his option, when he replevies the property, to give his bond either in double the amount of the plaintiff's decree, or in double the value of the property attached, conditioned to pay the debt, interest, and costs, if given for double the amount of plaintiff's demand, but, if for the value of the property, conditioned to pay the value of the property attached, with interest, as the case may be, in the event of his being cast in the suit. If the bond is given for double the value of the property, then the court may render judgment or decree against the defendant for the penalty of the bond, to be discharged or satisfied by delivery of the property or its value. In the event the bond is given for double the amount of plaintiff's demand, then the decree is for the penalty of the bond, to be satisfied by payment of the debt, but not exceeding the penalty of the bond."

The bond in this case does not clearly show that it was given in double the value of the attached property. If it did, the proper judgment would be for the penalty of the bond, "to be satisfied by delivery of the property or its value." Neither does it clearly appear that it was given for double the amount of plaintiff's demand, inasmuch as it is recited that the bond might be satisfied

by the payment of that demand or by the "return of the property." The debt of Evans was for $4,311.09, with interest from November 19, 1891, to January 16, 1892. The bond is for a sum considerably in excess of double this claim. Presumptively five miles of railway, together with two engines and other equipments, were worth much more than the amount of this bond. Yet the bond contains the condition that it may be discharged by a return of the property, a condition which applies only to a bond for double the value of the property attached. It is not strictly in compliance with either provision for a bond. The condition that it may be discharged upon return of the property is one which cannot be disregarded. The bond is in the alternative, and may be discharged by the performance of either one of the alternative conditions. Dumont v. U. S., 98 U. S. 142.

An irregular bond was construed in Kuhn v. Spellacy, 3 Lea, 278. Its condition was to return the property. Judge McFarland, one of the ablest judges of the Tennessee court, said:

"The bond is not strictly a statutory bond; that is, it is not, in terms, either in double the amount of the plaintiff's demand, conditioned to pay the same, or in double the value of the property attached, conditioned to pay its value, in the event he be cast in the suit, as provided by section 3509; but, its condition being to account for the property, it should be regarded as falling under the latter class,—that is, a bond in double the value of the property attached, conditioned to pay its value and interest in the event the defendant be cast in the suit. The proper judgment on this bond, as prescribed by section 3514, was a judgment for the penalty of the bond, which may be satisfied by the delivery of the property or its value." Kuhn v. Spellacy, 3 Lea, 280.

This case was followed in Ward v. Kent, 6 Lea, 131. Green v. Lanier, 5 Heisk. 662, and Barry v. Frayser, 10 Heisk. 217, are also in point as to the proper judgment on such a bond.

Following these Tennessee cases, construing a Tennessee statute, we hold that this bond must be regarded as a bond of the second class, and that its penalty is for double the value of the property attached. The proper decree is for the penalty of the bond, to be discharged upon the delivery of the property replevied. Inasmuch as the value is not specifically stated in the bond, it may, as was done in Kuhn v. Spellacy, supra, no reference having been asked below, be assumed that the value was one-half the penalty of the bond, or $4,500. By the payment of that sum, with interest from date of the bond, the decree may be discharged. The decree actually rendered was for a less sum than this. The appellants cannot, therefore, complain. Ward v. Kent, supra.

It was intimated in Kuhn v. Spellacy, supra, that it was perhaps unnecessary to recite in the decree that it might be satisfied by a return of the property, as the right accrues under the statute itself. However this might be, if this proceeding was in the state court, it is clearly right that the decree should be so modified as to permit the appellants to satisfy the decree by returning the property replevied. This they may do, provided the property shall be placed in the custody and possession of the circuit court within 30 days after that court shall modify the decree as hereby directed.

In all other respects the decree of the circuit court is affirmed. The costs of this appeal will be equally divided between appellants and appellees, in the event the attached property be returned, but, if not so restored, the appellants will pay all costs of appeal.