ROGERS v. NASHVILLE, C. & ST. L. RY. CO. et al.

(Circuit Court of Appeals, Sixth Circuit.    November 9, 1898.)

No. 550.

1. CORPORATIONS—SUIT BY STOCKHOLDER—FORMAL REQUISITES OF BILL.
    A bill by a minority stockholder of a railroad corporation against the corporation and the majority stockholders, which seeks to set aside as detrimental to the interests of the corporation a contract by which it leased certain lines of road from another company, and which in all other respects conforms to the requirements of equity rule 94, need not allege a demand upon the directors to bring the suit, and a refusal, where it shows that the lessor in the lease sought to be canceled holds a majority of the stock of the lessee corporation, and elected in its own interest a majority of the directors of such corporation, by whose action the lease was fraudulently made in the interests of the lessor.

2. SAME—RAILROADS—RIGHTS OF ANOTHER CORPORATION AS STOCKHOLDER.
    Under the special charter granted by the legislature of Tennessee to the Nashville, Chattanooga & St. Louis Railway Company, which provides that "any state or any citizen, corporation or company of this or any other state or country may subscribe for and hold stock in said company with all the rights and subject to all the liabilities of any other stockholder," a railroad company of another state, authorized thereto by its own charter, may become a holder of stock in such Tennessee company, with the right to vote the same for directors and upon all other questions.

3. SAME—AMENDMENT OF CHARTER—VOTING POWER OF STOCK.
    Where the special charter of a railroad company reserved to the legislature the right of amendment on the unanimous petition of the president and directors of the company, and the legislature afterwards, by general law amended all such charters by making a uniform rule as to the voting power of stock, differing from that fixed in the charter, an acceptance of such amendment by the unanimous vote of the president and directors

of the railroad company was the equivalent of the required petition, and rendered the amendment in full force as to the company.

**4. SAME—DIRECTORS—PRESUMPTION OF GOOD FAITH.**

That directors of a corporation were elected by a single stockholder, owning a majority of the stock, does not make them agents of such stockholder, nor raise any presumption that their action is otherwise than in the interest of the corporation.

**5. SAME—CONTRACT BETWEEN STOCKHOLDER AND CORPORATION.**

A stockholder is not a trustee, and there is no rule which prevents him from contracting with the corporation, but majority stockholders will not be permitted to make such contracts in their own interest which are unfair and oppressive to the minority.

**6. RAILROADS—LEASE OF OTHER LINES—STATUTE OF TENNESSEE.**

Under the statute of Tennessee in force in 1895, governing the leasing of railroads, which was embodied in Laws 1881, c. 9, as amended by Laws 1891, c. 61, the directors of a railroad corporation existing under the laws of that state had no power to conclude a lease of another line of road until it had been approved by the vote of three-fourths in amount of the capital stock of their company represented and voting at a regular or called meeting of stockholders.

**7. CORPORATIONS—ACTS ULTRA VIRES—COLLATERAL ATTACK.**

In a suit by a stockholder of a corporation to set aside a contract by which the corporation leased a railroad line from another corporation, the plaintiff cannot question the power of the lessor corporation to acquire the ownership of the leased line by purchase, where the purchase has been executed, and the title vested, after which the question of ultra vires can only be raised by the state in direct proceedings for the purpose.

**8. RAILROAD—POWER OF LEASED ROAD—STATUTES OF TENNESSEE.**

The statutes of Tennessee (Laws 1881, c. 9, as amended by Laws 1887, c. 198, and Laws 1891, c. 61) authorize all railroad corporations of the state to lease their property. Laws 1877, c. 12, § 2, provides that on the sale of the property of any railroad company situated in the state under foreclosure proceedings the purchaser shall be invested with all the franchises and property, with all the privileges and immunities appertaining thereto by the laws of the state. Laws 1877, c. 20, enacted on the same day, authorizes any railroad corporation whose corporate existence has been recognized by any act of the legislature of the state to become the purchaser of any railroad sold under judicial proceedings, or sold by any person, natural or corporate, who may have derived title through such judicial sale. *Held,* that a railroad corporation of another state, which had been recognized by an act of the Tennessee legislature, and which had become the purchaser of lines of railroad in the state formerly owned by Tennessee corporations, from one who acquired title thereto through foreclosure sales, became vested by virtue of such statutes with all the powers with reference thereto possessed by the mortgagor companies, including the power to lease such lines to any corporation competent under the laws of the state to become the lessee thereof.

### On Petition for Rehearing.

**9. STATUTES—REPEAL BY IMPLICATION.**

Where a later statute covers the whole subject embraced in a former act, and contains new provisions plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act.

**10. SAME—TENNESSEE STATUTES CONFERRING POWER TO LEASE RAILROADS.**

Mill. & V. Code Tenn. § 1273, provided that "any railroad company owning any main line may contract with any company owning a railroad connecting with such main line for the lease thereof," but made no provision as to the mode of exercising the power conferred. By Laws 1881, c. 9, § 2, as amended by Laws 1891, c. 61, power was given to all railroad companies then or thereafter existing under the laws of the state, or under the laws of that and any other state or states, to lease or let, or to acquire

by purchase, lease, or otherwise, any railroad or railroads in any state or states, "provided that the same be approved by the vote of three-fourths in amount of the capital stock of said company present and voting either in person or by written proxy at a regular or called meeting of the stockholders of said company." *Held*, that Code, § 1273, could not be considered a special or particular act not affected by the later general enactments, but that, as the later act covered the whole subject, it superseded and repealed said section, and the provision requiring the approval of the stockholders applied to a lease of connecting lines.

11. SAME.
Laws Tenn. 1891, c. 125, which merely enlarges the powers of railroad companies acquiring lines which connect with and form branches or extensions of their roads, by either purchase or lease, as to the mode of payment therefor, is not inconsistent with, and does not supersede or repeal, the provisions of existing general laws requiring the consent of stockholders to such purchase or lease.

Appeal from the Circuit Court of the United States for the Middle District of Tennessee.

This is a bill filed by a stockholder of the Nashville, Chattanooga & St. Louis Railway Company, in behalf of himself and all other stockholders in said railway company who may desire to become parties complainant thereto, against the Nashville, Chattanooga & St. Louis Railway Company and the Louisville & Nashville Railroad Company. The object of the bill is to obtain the cancellation of a lease entered into between the two corporations, whereby the Louisville & Nashville Railroad Company leased to the Nashville, Chattanooga & St. Louis Railway Company, for a term of 99 years, two lines of railroad connected and constituting a line of railway from Paducah, in the state of Kentucky, to Memphis, in the state of Tennessee. Separate demurrers were filed by each of the defendant companies, which were sustained by the circuit court, and the bill dismissed. The averments of the bill are substantially these:

(1) The complainant is a citizen of the state of New York, and is now, and has been for several years, an owner of shares in the capital stock of the Nashville, Chattanooga & St. Louis Railway Company, of the par value of $1,000,000.

(2) The Nashville, Chattanooga & St. Louis Railway Company is a corporation of the state of Tennessee, organized under a special legislative charter granted December 11, 1845, and owns and operates an original line of railway extending from Nashville to Chattanooga. Since the construction of its original line, said corporation has constructed, purchased, or leased several other lines of railroad now operated as one system in connection with its said main or original line. Among such acquired lines is one known as its St. Louis Division, extending from Nashville, via Hollow Rock and McKenzie, to Hickman, Ky. The capital stock of said company now consists of $10,000,000, divided into shares of $100 each.

(3) The Louisville & Nashville Railroad Company is a corporation of the state of Kentucky, chartered by a special act of the general assembly of that state, approved March 5, 1850; and its main and original line extends from Louisville, in Kentucky, via Bowling Green, to Nashville, in Tennessee, a distance of 185 miles. Since the construction of said original line it has purchased, constructed, leased, or otherwise extended its said line, until it now operates as one system some 3,000 miles of railroad. Among the additional lines thus acquired, is a railroad extending from its said main line at Bowling Green, in Kentucky, to Memphis, in Tennessee, via Paris and McKenzie, and known as the Memphis Division. It also acquired, and is now operating, a line from Nashville, in Tennessee, to St. Louis, in Missouri, via Evansville, Ind., and a line from Nashville to Decatur, Ala.; thence to Montgomery and Mobile, and thence to New Orleans. Besides these lines, it acquired a line from Louisville to Cincinnati, and numerous branch lines, both in Kentucky and Tennessee. Two other roads were subsequently acquired by said Louisville & Nashville Railroad Company, which form a continuous line from Pa-

ducah, in Kentucky, via Paris, Hollow Rock, Lexington, and Jackson, to Memphis, Tenn. This line of railway is the subject of the contract of lease between the two defendant corporations, which it is the object of the bill to set aside. This line so leased includes two originally separate railroads, originally constructed and operated by two distinct corporations. The title of the Louisville & Nashville Railroad Company to these two roads is thus stated by the bill: That part of the line extending from Paducah, in Kentucky, to Lexington, Tenn., was constructed and owned by the Paducah, Tennessee & Alabama Railway Company, a corporation organized under the laws of both Kentucky and Tennessee. The remainder of the line was constructed and owned by the Tennessee Midland Railroad Company, a corporation of the state of Tennessee. Both companies became insolvent, and defaulted in interest payments upon mortgage bonds. Under distinct foreclosure proceedings in the circuit court of the United States for the districts of Kentucky and West Tennessee, those roads were sold, and bought by one J. W. Phillips, whose bid upon each was $1,000,000, chiefly payable in the mortgage bonds of the respective companies. Phillips' bid was much less than the mortgage debt of either road. The conveyance to Phillips of the properties so sold is dated December 13, 1895. Subsequently, Phillips conveyed the same properties to the Louisville & Nashville Railroad Company for a recited aggregate consideration of $3,093,000. This deed bears date as of December 14, 1895.

(4) The bill further charges that in 1879 or 1880 the Louisville & Nashville Railroad Company purchased $5,500,000 of the $10,000,000 capital stock of the Nashville, Chattanooga & St. Louis Railway Company, and has ever since owned and controlled same. This stock, constituting a majority of the shares of the said Nashville, Chattanooga & St. Louis Railway Company, was conveyed in trust to the Central Trust Company of New York, to secure an issue of bonds, with the proviso that the voting power belonging to said shares of stock should be exercised by the said Louisville & Nashville Railroad Company, by means of proxies to be given to it, or its appointees, by the said trust company, from time to time. The bill specifically avers that "this purchase of stock was made for the direct purpose of overcoming a mischievous rival, and of increasing the revenue of the Louisville & Nashville Railroad Company, to the loss of the Nashville, Chattanooga & St. Louis Railway Company." It is further charged that "the Louisville & Nashville Railroad Company, by virtue of this ownership of the majority of stock in the Nashville, Chattanooga & St. Louis Railway Company,' has for years dominated and controlled the policy and business of the latter road, and still dominates and controls it, though the Nashville, Chattanooga & St. Louis Railway Company is operated in its own name." It is charged that through the voting power of this stock "it has from year to year elected a board of directors subservient to its own purposes," and that the present board of directors, which includes as a member Mr. M. H. Smith, the president of the Louisville & Nashville Railroad Company, was elected by the vote of its shares; and that this board, as well as its predecessors in office at the time of the transaction complained of, are entirely subservient to the will, wishes, and interests of the said Louisville & Nashville Railroad Company.

(5) The history of the contract under which the two roads were leased to the Nashville, Chattanooga & St. Louis Railway Company, as stated in the bill, is this: The board of directors of the Nashville, Chattanooga & St. Louis Railway Company, during the entire time covered by the transactions complained of, was composed of 15 members. On the 13th of December, 1895, a called meeting of the board was held at Nashville, at which were present only eight members, to wit, J. W. Thomas, G. M. Fogg, A. H. Robinson, M. Burns, J. H. Eakin, E. L. Jordan, N. C. Collier, and J. G. Aydelotte. At that meeting a resolution was adopted in these words: "Resolved, by the board of directors of the Nashville, Chattanooga & St. Louis Railway Company, that the lease by the Louisville & Nashville Railroad Company to this company of the railroads and properties of the Tennessee Midland Railway and the Paducah, Tennessee & Alabama Railroad for a period not exceeding six months, upon such terms and conditions as may be approved by the president of this board, be, and is hereby, ratified and approved, and the president

and secretary are hereby authorized, empowered, and directed to execute such contracts as may be necessary to put same into effect." December 17, 1895, another called meeting of the board was held, there being only eight members present, when an agreement for a 99-year lease was laid before the board, and ratified by a resolution in these words: "Resolved, by the board of directors of the Nashville, Chattanooga & St. Louis Railway Company, that the lease by the Louisville & Nashville Railroad Company to this company of the railroads and properties of the Paducah, Tennessee & Alabama Railroad and the Tennessee Midland Railway, as this day read, be, and the same is hereby, approved, subject to ratification by the stockholders; and the president and secretary are hereby authorized, empowered, and directed to execute said lease." Another called meeting of the board was held on September 9, 1896, at which was present complainant, Rogers, then, but not now, a director, and eight others. At said meeting the final lease was adopted by the vote of all save complainant, who protested and voted against its adoption. This adoption was not subject to ratification of the shareholders, as was the case with the action taken at the preceding meeting. On the same day, and immediately after this action, the annual meeting of the stockholders was held for the purpose of considering this lease and selecting a board of directors. Without doing either, this meeting was adjourned until December 8, 1896, by the vote of the shares held by the Louisville & Nashville Railroad Company. Complainant attended the said stockholders' meeting for the express purpose of opposing and defeating said lease, and had been given proxies by other minority stockholders to be voted in the same way, and represented and held proxies for more than 25,000 shares, a sufficient number to have defeated the lease under the law as complainant insists the law to be. To the adjournment he objected and protested, having, as he stated, traveled a thousand miles to defeat the lease. Complainant was unable to personally attend at the stockholders' meeting of December 8, 1896, but was represented at the meeting by others holding his proxy. Of 100,000 shares in all, 97,033 were present or represented. Of these, J. W. Thomas, president of the Nashville, Chattanooga & St. Louis Railway Company, held or represented 71,033 shares, including the 55,000 shares owned by the Louisville & Nashville Railroad Company. The minority opposing said lease held or represented 26,545 shares, a number sufficient to defeat its ratification if submitted. This minority demanded that all votes should be taken according to the scale of votes prescribed by section 20 of the charter, whereby no one stockholder was authorized to cast more than 500 votes. The chairman ruled that the charter had been legally amended so that each share should cast one vote, and this ruling was sustained by a share vote. To this the minority protested. An effort to elect a directory opposed to this lease was thus defeated, the controlling shares held by the Louisville & Nashville Railroad Company being cast in favor of a ticket which included its president, Milton H. Smith, and seven of the old directors, who had supported the adoption of the lease without ratification by the shareholders, thus securing a majority in the interest of the lease. After the transaction of some other business, not material here, the meeting was adjourned, over the protest of the minority, who endeavored to prevent such adjournment, and to have action taken in reference to said lease.

(6) The lease thus procured provides: First. That it is to be subject to a mortgage made by the lessor company to secure an issue of its 4 per cent. bonds aggregating $5,000,000, the lien whereof is to be prior in right to the interest acquired by the lessee. Second. That the lessee should pay annually during the said term $154,650, "being at the rate of 5 per cent. per annum on $3,093,000, the purchase price paid for the said properties." Third. An additional rental is to be paid of 5 per cent. upon any sums expended by the lessor during the term, not exceeding in all $1,200,000, in improving the leased property or supplying additional equipment. All such expenditures to be the subject of agreement between the parties, or in default of an agreement, referred to arbitration. Fourth. The lessee to pay all taxes and assessments against the property, and to keep, maintain, and preserve the property and equipment as well as all betterments or additions, "in as good repair as they now are, or as the same may be when they come into existence," and to

operate the said roads in such manner as to discharge all the lessor's public duties, and keep the same free from all liens of judgments, taxes, or charges of any kind, and to indemnify the lessor against all liability for loss or damage arising out of the operation of the said roads. Complainant charges that this lease thus imposed upon the Nashville, Chattanooga & St. Louis Railway Company, through the controlling influences of the lessor company, is most unfair and unjust in its terms, and will destroy the capacity of the lessee company to pay dividends, and thereby greatly impair the value of its stock. In support of this conclusion, complainant charges that the lines so leased had, before their acquisition, been operated as one line under agreement of the companies owning them, and constituted a competing and parallel line with the Memphis Division of the Louisville & Nashville Railroad Company; that this competition was between Paris and Memphis, and that travel and freight were diverted both at Paris and Hollow Rock from said Memphis Division; that the purpose in buying same was to stifle this competition; that neither road had ever been profitable property, and had not been able to make "operating expenses and fixed charges." The rental reserved is charged to be burdensome, and that the mere profit between the interest paid by the lessor upon the bonds issued to purchase same and the annual rentals received is more than $30,000 per year, and that this profit will be increased through further increase of rentals as improvements are made upon the leased road. It is also pointed out that, though the lease is subject to the lessor's mortgage, it contains no covenant of quiet enjoyment, or termination in case of foreclosure by mortgagee. The title of the Louisville & Nashville Railroad Company to the property so leased is challenged upon the ground that it has no power to buy said railroads.. The power of either company to enter into a contract for the leasing of said railroads is also denied, and the validity of the lease brought into question. The power of the Louisville & Nashville Railroad Company to own or vote upon the shares it claims of the capital stock of the Nashville, Chattanooga & St. Louis Railway Company, and the legality of the existing directory elected by the vote of said shares, is also denied.

Complainant says that, though he was a member of the board of directors which entered into this lease, yet he had no notice of either the first or second directors' meeting, notice of the first being mailed too late to reach him at his residence, in New York; that he was present at the meeting on September 9, 1896, and protested and voted against same; that he then owned and held proxies for more than 26,000 shares, and attended the meeting of shareholders called for September 9, 1896, with the avowed object of opposing and defeating the ratification of said lease, holding and representing the requisite number of shares to defeat its adoption, inasmuch as the authority to lease said road depended upon the ratification of the lease by three-fourths of the shares voting. Although the official notice of said meeting stated that the ratification of this lease was to be submitted to the stockholders at said meeting, yet complainant charges that this was not done, but that the meeting was adjourned over his protest without allowing any action to be taken until December 8, 1896. Complainant charges that both before and after said September 9, 1896, he objected and protested against said lease by letters and by conversations with J. W. Thomas, the president of the said Nashville, Chattanooga & St. Louis Railway Company; that at the December meeting of the stockholders he was not suffered to bring the matter to a vote, the meeting being again adjourned by the controlling vote of the lessor company. He denies that the suit is a collusive one, or brought by him for the purpose of giving to a federal court a jurisdiction which it would not have if the suit had been brought by the Nashville, Chattanooga & St. Louis Railway Company. He concludes by saying that "he has exhausted all the means within his reach to obtain redress of the grievances within the corporation itself; that a demand on the directors to bring the present suit would be futile and useless for the many reasons herein set forth." The prayer of the bill is that the said proposed lease "be declared ultra vires, invalid, and not binding upon the said Nashville, Chattanooga & St. Louis Railway Company, and order the same surrendered and canceled." There is also a prayer for other and general relief, etc.

James Trimble and A. L. Demoss, for appellant, Rogers.

Edward H. East and J. D. B. Debow, for appellee Nashville, C. & St. L. Ry. Co.

J. M. Dickinson, for appellee Louisville & N. R. Co.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The relief sought is the cancellation of the lease entered into between the Nashville, Chattanooga & St. Louis Railway Company and the Louisville & Nashville Railroad Company. This relief is asked upon several grounds: First, because the contract was fraudulently imposed upon the Nashville, Chattanooga & St. Louis Railway Company by the Louisville & Nashville Railroad Company through its controlling influence as a majority shareholder; second, because the contract is ultra vires, one or both companies; and, third, because, if neither void as ultra vires, nor voidable for fraud, it is such a contract as cannot be legally consummated without ratification by a three-fourths vote of the shareholders. Ratification by a three-fourths vote has never been had, and it is charged that more than one-fourth of the shares are opposed to the lease, and that, though two shareholders' meetings have been held since the making of the lease, action in regard thereto was prevented through adjournments carried by the voting power of the shares held by the lessor company. To this bill the defendants severally demurred. These demurrers go both to the form of the bill and to the merits. The decree below sustained each separate ground of demurrer, though the opinion of the district judge who heard the case is devoted chiefly to the demurrer going to the form of the bill for supposed want of conformity to equity rule No. 94. The remaining grounds of demurrer appear to have been sustained pro forma as a means of eliciting the opinion of this court upon the merits in the event the form of the bill should be regarded as sufficient.

First, as to the form of the bill. The contract of which complaint is made is an injury to all the members of that corporation, and not one to complainant exclusively. The complaint is, that a majority of the directors, to whom is intrusted the exercise of corporate powers for the corporate good exclusively, have betrayed this trust by exceeding the corporate powers, and by entering into an agreement with a majority shareholder very detrimental to the true and exclusive interests of the corporation they represent. The suit, is, therefore, one founded upon alleged wrongs which the corporation itself should properly represent. The general rule is that a corporation shall sue in its corporate character and name. To justify a departure from this rule by entertaining a suit by an individual member for an injury founded upon a corporate wrong, reasons of a most urgent character must be shown. The essential averments of such a bill by a stockholder were elaborately considered in Hawes v. Oakland, 104 U. S. 450, and the practice there declared was subsequently formulated into a rule, and promulgated as equity rule No. 94. The principal matter considered in Hawes v. Oakland was

that of collusive suits, wherein, through a simulated unwillingness of the corporation to bring the suit in its own name and character, jurisdiction was given to a federal court through a suit by a shareholder whose citizenship was such as to give jurisdiction. So far as rule No. 94 deals with the subject of collusive jurisdiction, its requirements are new, and should be closely observed. So far as it deals with the general form of such bills, it prescribes no other or different practice than that commonly imposed by courts of equity. This is evident from the reasoning and conclusions in Hawes v. Oakland. This bill is unobjectionable in form, so far as the rule relates to the matter of collusive jurisdiction. It is stated that the complainant was a shareholder at the time of the transaction complained of, and is a shareholder now, and that the suit is not a collusive one to confer jurisdiction on a court of the United States in respect to a matter of which it would not otherwise have cognizance, and is properly verified by the oath of the complainant. The objection urged is in respect to the other requirement of the rule that such a bill "shall set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action." The averments of the bill touching the attitude of this complainant towards this lease leave no room to doubt his constant, consistent, and well-understood opposition. What he did to prevent its consummation has been sufficiently stated in stating the case, and need not be repeated. It is not averred that before doing so he requested the directors to bring and conduct this suit. Upon the contrary, it is stated that, having exhausted all known means of defeating the lease within the corporation, he brought this suit, without demanding that the directors should themselves direct and conduct it, upon the ground that such a demand under the facts and circumstances stated in the bill would be idle and nugatory. Undoubtedly, the general rule is that such a bill should contain an averment that a demand was made upon the corporate agents to bring the suit, and that it had been refused or neglected. Memphis City v. Dean, 8 Wall, 73; Cook, Stock, Stockh. & Corp. Law, § 240. But there are well-settled exceptions to this general rule. The circumstances may be such that the demand would be an idle form, or the suit of such character that it could not be decently brought or managed by those controlling the corporation. A demand and refusal furnish the best evidence that the corporation is unable to protect the rights of its members; but, if the facts are such as to show that such a demand would be an idle ceremony, or the action required be such as that the guilty agents of the corporation ought not to be intrusted with the conduct of the necessary suit, none need be made. Mor. Priv. Corp. §§ 241, 242; Cook, Stock, Stockh. & Corp. Law, § 741; Atwool v. Merryweather, L. R. 5 Eq. 464, note; 2 Pom. Eq. Jur. § 1095. The limitation upon the general rule is thus stated at section 1095, 2 Pom. Eq. Jur.:

"This condition of fact, however, is not indispensable. The action may be indispensable. The action may be maintainable without showing any notice, request, or demand to the managing body, or any actual refusal by them to prosecute; in other words, the refusal may be virtual. If the facts alleged show that the defendants charged with the wrongdoing, or some of them,

constitute a majority of the directors or managing body at the time of commencing the suit, or that the directors, or a majority of them, are still under the control of the wrongdoing defendants, so that a refusal of the managing body, if requested to bring the suit in the name of the corporation, may be inferred with reasonable certainty, then an action by a stockholder may be maintained without alleging or proving any notice, request, demand, or express refusal. In like manner, if the plaintiff's pleadings disclose any other condition of fact which renders it reasonably certain that a suit by the corporation would be impossible, and that a demand therefor would be nugatory, the action may be maintained without averring a demand or any other similar proceeding on the part of the stockholder plaintiff."

. Aside from all questions of ultra vires, one ground for relief stated in the bill is that the lessor company, through the voting power of the majority of shares owned by it, has elected a majority of the directors of the lessee company, and, through its influence with that majority, has imposed upon the lessee company a contract with itself, which is oppressive and prejudicial to the general interests of the members of the dominated corporation, and beneficial only to the controlling lessor company. That a majority of the managing officers of the Nashville, Chattanooga & St. Louis Railway Company may have made a bad bargain through misjudgment as to the value of such a lease would be wholly insufficient of itself to justify a court of equity in setting the contract aside at the instance of a dissenting minority. The wisdom or foolishness of such a contract is wholly a question of internal management, to be corrected within the corporation. But this bill charges that this oppressive and prejudicial contract has resulted from the nonexercise of honest judgment by those intrusted with corporate management, and that it has been brought about through the improper and illegal influence of the lessor as dominating stockholder. Thus the gravamen of this ground for relief is fraud, simple fraud. Now, if such a fraud be sufficiently charged, it must be clear that any request to the directors guilty of such an abuse of corporate trust, or interested in supporting the lease so made through interest in the lessor company, would be an idle ceremony. More than that. Such a suit could not be decently managed and controlled by those whose conduct and motives would be necessarily brought in question. Under such circumstances the act is incapable of confirmation by a majority, and a suit will be entertained by minority shareholders in behalf of themselves and all other shareholders, the corporation and offending shareholders being defendants, to set aside such contract, and restore the status quo. When the bill shows that such a fraud has been committed by one who commands a majority of votes in the managing board and in a stockholders' meeting, a member may sue without making a demand upon the managing directors to institute proceedings to undo that which they themselves have done or approved. The reason is plain. If a minority shareholder might not have a remedy under such circumstances, the majority could defraud the corporation, and ruin the minority, with absolute impunity. This question came before the United States court of appeals for the Second circuit in De Neufville v. Railroad Co., 51 U. S. App. 374, 26 C. C. A. 306, 81 Fed. 10, where a bill was filed by a stockholder, as in this case, and for the purpose of asserting the rights of the corporation against the title of a dominating stockholder who had acquired the controlled

railroad under a foreclosure sale. The bill was demurred to for noncompliance with rule No. 94. This ground of demurrer was overruled, the court saying:

"There is no force to the suggestion that the bill is defective in failing to 'set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action.' In view of the averments that defendants obtained control of a majority of the stock and bonds on purpose to wreck the New York & Northern; procured, by resignation and election, a board of directors in harmony with that purpose, and which board did in fact, by refusing profitable business and diverting traffic, accomplish such purpose,—it would be an idle waste of time to urge the board of directors, or the majority stockholders who initiated and consummated the fraud, to bring suit in order to secure judicial condemnation of their own actions."

To the same effect are: Cook, Stock, Stockh. & Corp. Law, § 662; Mor. Priv. Corp. § 252; Menier v. Telegraph Works, 9 Ch. App. 350; Mason v. Harris, 11 Ch. Div. 97; Cab Co. v. Yerkes, 141 Ill. 320, 30 N. E. 667; Barr v. Glass Co., 40 Fed. 412; Brinckerhoff v. Bostwick, 88 N. Y. 52; Heath v. Railway Co., 8 Blatchf. 347, Fed. Cas. No. 6,306; Rogers v. Agricultural Works, 52 Ind. 296–306; Parrott v. Byers, 40 Cal. 614–622; Hodges v. Screw Co., 1 R. I. 312–340; Atwool v. Merryweather, L. R. 5 Eq. 464, note; Brewer v. Boston Theater, 104 Mass. 378–393, et seq.; Deaderick v. Wilson, 8 Baxt. 108–131; Slattery v. Transportation Co., 91 Mo. 217–225, 4 S. W. 79; Ranger v. Cotton-Press Co., 52 Fed. 611; Meeker v. Iron Co., 17 Fed. 48.

In Atwool v. Merryweather, L. R. 5 Eq. 464, note, a bill was sustained by members of a corporation against the corporation and two of the directors, and without any request to sue, upon the ground that a majority of the shares were under the control of the parties charged with the fraud against the corporation. It appeared in that case that the transaction complained of was a simple fraud upon the corporation, and was not an ultra vires act, and that at a stockholders' meeting a majority of shares voted to ratify the contract. It appeared, however, that the shares of the beneficiaries in the fraud were voted in favor of ratification, and that without these shares the majority was the other way. The doctrine of Foss v. Harbottle, 2 Hare, 461, was supposed to prevent the filing of a bill by members of a corporation to set aside a contract which was not ultra vires, and might be, therefore, ratified by the members. To this Vice Chancellor Sir W. Page Wood, said:

"If I were to hold that no bill could be filed by shareholders to get rid of the transaction on the ground of the doctrine of Foss v. Harbottle, it would be simply impossible to set aside a fraud committed by a director under such circumstances, as the director obtaining so many shares by fraud would always be able to outvote everybody else."

In Menier v. Telegraph Works, 9 Ch. App. 350, a bill was filed by a shareholder in behalf of himself and all other shareholders against the European Company, in which he was a shareholder, Hooper's Telegraph Works, another corporation, and two of the directors of his own company, for the purpose of preventing the carrying out of a resolution for the winding up of the European Company, and for the abandonment of a pending suit involving the ownership of a valuable concession claimed to have been granted to one Baron de Mana in trust for the European

Company. It was charged that these resolutions were adopted "through the influence of Hooper's Company and by the vote of directors elected by the shares owned by Hooper's Company in the European Company, said company owning an absolute majority." It was also charged that the abandonment of the pending suit and the resolution to wind up were prejudicial to the interests of the European Company and to the advantage of Hooper's Company, and to enable Hooper's Company to accomplish purposes of its own. The bill was demurred to upon the ground that it should be filed in the name of the European Company. There was no averment that the managing directors of the European Company had been applied to to bring the suit. The demurrer was overruled. Upon appeal this ruling was sustained. Sir W. M. James, said:

"I am of opinion that the order of the vice chancellor in this case is quite right. The case made by the bill is, very shortly, this: ' The defendants, who have a majority of shares in the company, have made an arrangement by which they have dealt with matters affecting the whole company, the interest in which belongs to the minority as well as to the majority. They have dealt with them in consideration of their obtaining for themselves certain advantages. Hooper's Company have obtained certain advantages by dealing with something which was the property of the whole company. The minority of the shareholders say, in effect, that the majority has divided the assets of the company, more or less, between themselves, to the exclusion of the minority. I think it would be a shocking thing if that could be done, because, if so, the majority might divide the whole assets of the company, and pass a resolution that everything must be given to them, and that the minority should have nothing to do with it. Assuming the case to be as alleged in the bill, then the majority have put something into their pockets at the expense of the minority. If so, it appears to me that the minority have a right to have their share of the benefits ascertained for them in the best way which the court can do it, and given to them. It is said, however, that this is not the right form of suit, because, according to the principles laid down in Foss v. Harbottle, 2 Hare, 461, and other similar cases, the court ought to be very slow, indeed, in allowing a shareholder to file a bill, where the company is the proper plaintiff. This particular case seems to me precisely one of the exceptions referred to by Vice Chancellor Wood in Atwool v. Merryweather, L. R. 5 Eq. 464, note, a case in which the majority were the defendants, the wrongdoers, who were alleged to have put the minority's property into their pockets. In this case it is right and proper for a bill to be filed by one shareholder on behalf of himself and all other shareholders."

Mason v. Harris, 11 Ch. Div. 97, was a case of much the same character. The bill was filed by a minority of shareholders against three of the directors, being a majority, and the corporation, for the purpose of setting aside, for fraud, a sale made to the corporation by one of the directors. The bill alleged that the selling director and the other two made defendants constituted a majority, and that those two were under the control and influence of the selling director, who owned a majority of the shares in the company, and against whom no step could be taken within the company to remedy the wrong. It was held that the bill would lie, and that the acts were such that no majority of stockholders could sanction so as to bind the minority, and that the allegations were such as to make it clear that it was impossible to get the company to impeach them. Jessel, M. R., said:

"As a general rule, the company must sue in respect of a claim of this nature, but general rules have their exceptions, and one exception to the rule

requiring the company to be plaintiff is that, where a fraud is committed by persons who can command a majority of votes, the minority can sue. The reason is plain, as, unless such an exception were allowed it would be in the power of the majority to defraud the minority with impunity. * * * It appears that Harris (the selling director) has obtained such influence over the directors that a majority side with him, and will not do anything to remedy the wrong complained of. It further appears that Harris holds such a number of shares that he can outvote those who wish the sale set aside. By reason, therefore, of his influence with the directors and his number of votes, he has the sole control of the company. The case is precisely within the rules laid down by Lord Justice James in Menier v. Telegraph Works, 9 Ch. App. 350. Is it reasonable to say to a minority of shareholders who are defrauded by the majority that they must apply to the company to institute proceedings? Even independently of the authorities, I should be prepared to say 'No.' Facts are alleged which show it to be impossible to get the company to impeach the acts complained of."

The case of Transportation Co. v. Beatty, 12 App. Cas. 589, is not in conflict with the cases cited. The claim in the suit was to set aside a sale made to the company by Beatty, who was a director, of a steamer of which he was sole owner. A by-law providing for the purchase of this steamer was passed by the directors by a majority vote, Beatty's vote being necessary to make the majority. Under this by-law the contract of purchase was at once made. Later this by-law was submitted to the stockholders for ratification, and was ratified by a majority, Beatty's shares being a necessary part of the majority. The minority filed the bill, making the company and Beatty parties defendant. All question of fraud was eliminated from the case by the facts found by the inferior courts, and the decision both below and in the privy council was made to turn upon the single question as to whether Beatty could properly vote his stock in confirmation of the sale he had made. The court held that the original contract between the directors and Beatty could not have been enforced by Beatty in consequence of his fiduciary relations to the company as a director, but that any such dealing or arrangement might be affirmed or adopted by the company, provided it was not brought about by unfair means, and was not "illegal or fraudulent or oppressive towards those shareholders who opposed it." Finding that the contract was not oppressive or illegal or fraudulent, the court held that the case must turn upon the simple question as to whether Beatty, as a shareholder, might vote his shares in confirmation of what had been done. Upon this subject the court said:

"Unless some provision to the contrary is to be found in the charter or other instrument by which the company is incorporated, the resolution of a majority of the shareholders, duly convened, upon any question with which the company is legally competent to deal, is binding upon the minority, and consequently upon the company, and every shareholder has a perfect right to vote upon any such question, although he may have a personal interest in the subject-matter opposed to, or different from, the general or particular interests of the company."

Touching the possibility of an oppressive use of power by an interested majority of shareholders, the court said:

"The only unfairness or impropriety which, consistently with the admitted and established facts, could be suggested, arises out of the fact that the defendant J. H. Beatty possessed a voting power as a shareholder which enabled him, and those who thought with him, to adopt the by-law, and thereby either to ratify and adopt a voidable contract into which he, as a director,

and his co-directors, had entered, or to make a similar contract; which latter seems to have been what was intended to be done by the resolution passed on the 7th of February. It may be quite right that in such a case the opposing minority should be able, in a suit like this, to challenge the transaction, and to show that it is an improper one, and to be freed from the objection that a suit with such an object can only be maintained by the company itself. But the constitution of the company enabled the defendant J. H. Beatty to acquire this voting power. There was no limit upon the number of shares which a shareholder might hold, and for every share so held he was entitled to a vote. The charter itself recognized the defendant as a holder of 200 shares, one-third of the aggregate number. He had a perfect right to acquire further shares, and to exercise his voting power in such a manner as to secure the election of directors whose views upon policy agreed with his own, and to support those views at any shareholders' meeting. The acquisition of the United Umpire was a pure question of policy, as to which it might be expected that there would be differences of opinion, and upon which the voice of the majority ought to prevail. To reject the votes of the defendant upon the question of the adoption of the by-law would be to give effect to the views of the minority, and to disregard those of the majority."

A question of like character received very able consideration by the court of appeals of New York in Gamble v. Water Co., 123 N. Y. 91, 25 N. E. 201, the opinion being by Justice Peckham. While upholding the general right of a majority stockholder to vote his stock in his own interest, the court said that the action resulting from such power "must not be so detrimental to the interests of the corporation itself as to lead to the necessary inference that the interests of the majority of the shareholders lie wholly outside of, and in opposition to, the interests of the corporation and of the minority of the shareholders, and that their action is a wanton or fraudulent destruction of the rights of such minority. In such cases it may be stated that the action of the majority of the shareholders may be subjected to the scrutiny of a court of equity at the suit of the minority shareholders."

Touching the circumstances under which a dissenting minority might challenge a contract imposed upon the company by the vote of an interested majority shareholder, the learned court, after referring to Transportation Co. v. Beatty, 12 App. Cas. 589, said:

"I think that where the action of the majority is plainly a fraud upon, or, in other words, is really oppressive to, the minority shareholders, and the directors or trustees have acted with, and formed part of, the majority, an action may be sustained by one of the minority shareholders suing in his own behalf and in that of all others coming in, etc., to enjoin the action contemplated, and in which action the corporation should be made a party defendant. It is not, however, every question of mere administration or of policy in which there is a difference of opinion among the shareholders that enables the minority to claim that the action of the majority is oppressive, and which justifies the minority in coming to a court of equity to obtain relief. Generally, the rule must be that in such cases the will of the majority shall govern. The court would not be justified in interfering, even in doubtful cases, where the action of the majority might be susceptible of different constructions. To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences

to the company and in a manner inconsistent with its interests. Otherwise the court might be called upon to balance probabilities of profitable results to arise from the carrying out of the one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seemed to it to promise the best results, or at least to enjoin the carrying out of the opposite policy. This is no business for any court to follow."

That the Louisville & Nashville Railroad Company had the power to acquire, hold, and vote shares in the capital stock of the Nashville, Chattanooga & St. Louis Railway Company cannot be successfully denied. Such a purchase was not in excess of its chartered power, for the express power was conferred by an amendment of its charter granted January 27, 1880. Comity requires that this charter power shall be recognized as valid if not opposed to some law or policy of the state creating the corporation in which stock has been acquired. It is impossible in the present state of Tennessee legislation to say that this charter power is either opposed to any law or policy of that state. Upon the contrary, section 17 of the special charter granted to the Nashville, Chattanooga & St. Louis Railway Company expressly invites such ownership by providing that "any state or any citizen, corporation or company of this or any other state or country, may subscribe for and hold stock in said company, with all the rights and subject to all the liabilities of any other stockholder." In addition to this, Acts 1881, c. 9, authorizes all railroad companies, "existing under the laws of this state or of this state and any other state or states," to acquire, by "purchase or otherwise, and hold or dispose of, any bonds or shares of the capital stock of any railroad company or companies in any state or states." This provision does not cover the Louisville & Nashville Railroad Company, which is neither a corporation of this state nor of this and another state, but it indicates so broad a policy in respect to such transactions as to forbid the courts from saying that ownership of such shares is contrary to the public policy of this state. The right to own and vote this stock carries with it the right to vote for directors and to vote the stock upon all questions in which the owner has an interest. Transportation Co. v. Beatty, 12 App. Cas. 589; Gamble v. Water Co., 123 N. Y. 91, 25 N. E. 201; Beach, Priv. Corp. § 247; Mor. Priv. Corp. § 729.

That this majority of the stock has been used for the purpose of electing a board of directors selected by the majority owner is no cause for complaint. The majority, rather than the minority, are entitled to control, provided that control be not used oppressively, and for the outside and illegal purposes of obtaining unjust advantages at the expense of the legitimate interests of the minority. That this owner and holder of the majority of the stock has always claimed and exercised the right of casting one vote at shareholders' meetings for each share of stock is made a ground for complaining that this stock has been oppressively and illegally used for dominating the affairs of the Nashville, Chattanooga & St. Louis Railway Company. If this claim of a vote for each share was illegal, as claimed, this bill is not so framed as to entitle complainant to any decree ousting the present board of directors from their offices, inasmuch as the members of the board are not parties to the bill. Perhaps if they were, and this relief was properly sought, the bill would be multifarious, as combining two wholly distinct subjects. As framed,

this complaint can only be looked to as one of the aggravating evidences of an alleged arbitrary and oppressive method of dominating this lessee railroad company by the lessor corporation. We are, however, of opinion that this complaint is not well taken. The power to amend the charter of the Nashville, Chattanooga & St. Louis Railway Company was reserved in the charter to be exercised by the legislature upon the "unanimous petition of the president and directors" praying for a particular amendment. Under this original charter, the stockholders were entitled to vote according to a certain scale therein set out, which scale was so arranged as that no holder of shares should be entitled to vote more than 500 votes. By an act of the legislature of Tennessee found in Acts 1869, c. 2, § 4, all charters having this scale were so amended as to entitle each shareholder to one vote for each share. This amendment was not obtained upon the unanimous petition of the president and directors, as provided by the charter mode of obtaining amendments, and this is the basis for the contention of complainant that the scale provided in the charter is still the only lawful method of voting. This amendment, in 1875, was, however, unanimously accepted by the president and directors, and for 20 years has been acted upon as a lawful amendment of the charter in that particular. The validity of such an acceptance by another railroad company, having a like charter scale and a similar provision as to the power of amendment of the charter, came before the supreme court of Tennessee in Deaderick v. Wilson, 8 Baxt. 108, 125, 126. The subsequent unanimous acceptance by the president and directors was held by the court to be the equivalent of a prior petition of the same character, and the amendment thereby given full validity. This case is conclusive, and fully meets with our concurrence.

That the directors of the Nashville, Chattanooga & St. Louis Railway Company were elected by this holder of a majority of the stock does not make them agents of that interest, nor raise any legal presumption that they are or will be unfaithful to the true and general interests of the corporation whose powers they exercise. Trust Co. v. Bridges, 16 U. S. App. 115–141, 6 C. C. A. 539, 57 Fed. 753. Inasmuch as a stockholder is not a trustee and holds and acts for himself alone, there is no rule which forbids his contracting with his own company. Oil Co. v. Marbury, 91 U. S. 587–589. But the majority shareholders will not be permitted to use this power of control for the purpose of obtaining advantages for themselves at the expense of the minority, and, when an unfair and oppressive contract is shown, a case is made which will authorize interference on behalf of the injured minority.

If it be true, as explicitly charged, that this majority of stock was purchased "for the purpose of overcoming a mischievous rival, and of increasing the revenues of the L. & N. R. R. Co., to the loss of the N., C. & St. L. Ry. Co.," and that this power of control has been used to impose upon the controlled company a disastrous contract, and thus accomplish the alleged purposes in acquiring control, it would, indeed, be unavailing to expect the controlling influences to institute such a suit as this, and rule 94 would have no application. De Neufville v. Railroad Co., 26 C. C. A. 306, 81 Fed. 10, and 51 U. S. App. 374.

If it be true, as charged, that the lease now in question is so highly

prejudicial to the true and exclusive interests of the lessee company as to greatly impair, if not destroy, its ability to continue to pay dividends, then that fact will tend to establish the further charge that the true interests of the lessee company were not represented, and that the majority of the directors in consenting to so ruinous a contract intended to subserve the purposes and interests of the majority stockholder, regardless of consequences to the true and exclusive interests of the corporation whose power they were exercising.    In the face of such averments as these, we cannot deny to the minority a right to challenge this contract in a suit of this character.    If the averments and charges of the bill in this particular be true, the corporation is not able to prosecute or conduct this suit, being still under the control of the same influences which led to the original authorization of the contract.    It would be a travesty upon justice to expect self-respecting managing officers to begin and prosecute a suit in which their own good faith and loyalty should be the principal question involved. · Under these circumstances, this bill is rightly filed and no demand upon the officers of the corporation was necessary.    The demurrer, going to the form and general equity of the bill, must be overruled.

But other and distinct objections to the validity of this lease remain to be considered.

1. This lease has never been submitted to or approved by the stockholders of the lessee corporation.    For appellee it has been insisted that the president and directors had the power to accept this lease, and have done so, and that consent of three-fourths or any other number of stockholders is unnecessary.    This position is supported by the language of Act 1857–58, c. 8, which is in these words:

"Section 1. Be it enacted by the general assembly of the state of Tennessee, that the Nashville & Chattanooga Railroad Company are hereby authorized and empowered to lease the Winchester & Alabama Railroad, and the branch to Fayetteville, or any other railroad connecting with said Nashville & Chattanooga Railroad, for such time and upon such terms and conditions as may be agreed upon between the president and directors of said Nashville & Chattanooga Railroad Company and the president and directors of the railroad company contracted with.

"Sec. 2. Be it further enacted, that the companies of all laterals and main line railroad companies shall be entitled to the benefits of this act, and shall have the benefits and privileges and powers conferred on the said companies mentioned in the first section of this act."

Is this act now in force?    This act, whether it be regarded as a special or general public law, was revised and carried into the Code of 1858 as section 1122 (Revision of Thompson & Steger), and is found in the Revision of Milliken & Vertrees as section 1273.    As codified it is in these words:

"Any railroad company owning any main line may contract with any company owning a railroad connecting with such main line, for the lease thereof."

The Code itself, by section 42, provides that:

"All public and general laws passed prior to the present session of the general assembly, and all public and special acts the subjects whereof are revised in this Code * * * are hereby repealed, and in case of any conflict between the acts of this session and this Code the latter shall be controlling."

This Code went into effect May 1, 1858.

The verbiage of the first section of this act of 1857–58 would seem to indicate that, as originally introduced, it was intended alone for the benefit of the two railroad companies mentioned therein.    But the section following extended the benefits of the act to all corporations owning either branch or trunk lines, and this widened scope of the act is indicated by the caption itself.    The act came thus to be a general law, increasing the powers of all railroad companies of the description in the act.    But, whether we treat it as a special or general public law, it was a law dealing with the power of railroad corporations to make or accept leases of the constructed lines owned by other railroad corporations. That subject was revised in the Code of 1858, and the effect of such revision was to repeal the provisions of the previous act, and substitute therefor the legislation found in the Code.    Thus the Code conferred the power without prescribing the mode of its exercise.

By Act 1881, c. 9, § 1, power was given to all railroad companies "now or hereafter existing under the laws of this state, or of this state and any other state or states," to issue bonds and secure same by mortgage, or to issue debenture or income bonds, and such guarantied, preferred, and common stock as should be determined upon by the votes of three-fourths of the entire stock of such company.    By section 2, power was given to the same description of corporations "to build, lease or let, or acquire by purchase, lease or otherwise, and operate, hold or dispose of, any railroad or railroads in any state or states  *  *  * and to acquire, by purchase or otherwise, and hold or dispose of, any bonds or shares of the capital stock of any railroad company or companies in any state or states, and to indorse or guarantee the bonds of any railroad company or companies in any state or states, and whose original charter of incorporation was granted by the state of Tennessee. Provided, that the same be approved by the votes of three-fourths in amount of the entire stock of said company, at a regular or called meeting of the stockholders of said company," etc.    This act covers the subject of leasing and purchasing other railroads by railroad corporations of this state as well as other most important and vital powers of such companies, and regulates the exercise of the powers thus conferred.    Its effect is to regulate the power of leasing conferred by section 1122 of the Code, by requiring that any such lease shall be approved by three-fourths in amount of the entire capital stock of the leasing company. Act 1887, c. 198, authorized all corporations, "existing under the laws of this state," to "lease and dispose of their property" to any corporation of this or any other state "engaged in or carrying on  *  *  *  the same general business as is authorized by the lessor corporation," and such lessee corporation was by the same act authorized to accept any such lease.    The act contains several provisos, one of which was that any such lease should be made under the direction of the directors of such corporation when authorized or approved by the vote of a majority in amount of the stock of each corporation.    Another proviso provided that "this act shall not be so construed as to authorize any corporation of this or any other state to lease or purchase any competing line of railroad."    This act makes no reference to any previous legislation upon the same subject, and contains no repealing clause.  Inasmuch as it conflicts in respect to the previous mode of exercising this power of leasing or purchasing railroads, it must be regarded as so amending Act

1881, c. 9, as to require only the consent of a majority of the stockholders of each contracting company. This was followed by Act 1891, c. 61, which amended act 1881, c. 9, so that section 2 of that act should read: "Provided, that the same be approved by the vote of three-fourths in amount of the capital stock of said company present and voting, either in person or by written proxy, at a regular or called meeting of the stockholders of said company." This act makes no reference to act 1887, c. 198, and contains no repealing clause. The necessary effect of the act was to revive the provisions of the older act of 1881, so far as they related to the subject of leasing or purchasing railroads by railroad corporations "existing under the laws of Tennessee," "or of this and any other state or states." This was the state of the law upon this subject when the contract of leasing here in question was made. The conclusion we reach is that the power of the Nashville, Chattanooga & St. Louis Railway Company to accept the lease in question depended upon act 1881, c. 9, as amended by act 1891, c. 61.

The directors of that company had no power to conclude the lease in question until it was approved by the vote of three-fourths in amount of the capital stock represented and voting at a regular or called meeting of stockholders. This approval is vital to the consummation of such a contract, and no valid engagement can be concluded until such approval is had. The facts stated in the bill show that this approval was not sought, and that a vote of the shareholders was prevented through the voting power of the majority stock owned by the lessor company. The provision of the original resolution of the directors authorized this lease subject to the approval of the stockholders. This was rescinded, and its approval voted, and the lease authorized, without any submission to the stockholders. This was a flagrant disregard of the rights of the objecting minority of stockholders for which a bill of this description will lie as the only adequate remedy, under the facts stated in this bill.

2. Other and more vital questions remain for consideration. It has been very earnestly urged that this contract is ultra vires the power of both the contracting companies. It is well settled that a contract of leasing which is beyond the power of either of the contracting railroad corporations would be as invalid as if beyond the power of both. St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co., 145 U. S. 393–404, 12 Sup. Ct. 953; Louisville & N. R. Co. v. Kentucky, 161 U. S. 677–692, 16 Sup. Ct. 714.

Incidentally it is said that the Louisville & Nashville Railroad Company had no power to become the purchaser of these leased lines, and that it cannot, therefore, dispose of same, even though it might lease them if it had lawfully acquired them. We do not think that this complainant, in his character as a stockholder of the Nashville, Chattanooga & St. Louis Railway Company, is in a position to make this question. The railroads in question were sold at a judicial sale. The purchaser at that sale has conveyed them by deed to the Louisville & Nashville Railroad Company. The transaction is an executed one, and the title has actually vested in the purchaser. The general power to purchase the railroads of other companies is conferred by the amendments to the charter of the Louisville & Nashville Railroad Company made January 17, 1856, and by Act 1878, c. 278.

By Act 1877, c. 20, Tennessee consented that railroad corporations of

other states, whose existence in this state had been legislatively recognized, might become the purchasers of any railroad in this state sold under judicial proceedings. This power has never been withdrawn. The Louisville & Nashville Railroad Company is within the provisions of this act. Its "corporate existence" was recognized by Acts Tenn. 1851–52, cc. 23–62, and under the license thus granted it has been operating its railroad in Tennessee. Goodlett v. Railroad Co., 122 U. S. 391, 7 Sup. Ct. 1254. Neither is there any general statute prohibiting the acquisition of parallel and competing lines. If, therefore, the Louisville & Nashville Railroad Company has exceeded its charter or legislative powers in either state, it is because it acquired a parallel and competing line to its own original and authorized line. If this is prohibited in Kentucky, it is because such a purchase is in violation, not of its general charter power, but of the constitutional prohibitions found in section 201 of the constitution of Kentucky. If prohibited in Tennessee, it is because of some public policy which has not yet found expression in any affirmative legislative prohibition. In neither event is the question one which can be raised in this collateral way by this complainant. If the contract was in fieri, it might be open to a stockholder of the Louisville & Nashville Railroad Company as such, and upon a bill properly framed to restrain his company's officers from completing such an illegal transaction. But that is not this case. This is an executed transaction. The title has vested. It may be a defeasible title, but it has passed out of Phillips by his deed and is vested in his conveyee. Until the state shall institute proceedings for the forfeiture of the charter or for the purpose of defeating the title, it is a sound legal title, and will support this lease, unless it be subject to other objections. The principle involved is that applied in the cases of Railroad Co. v. Evans, 31 U. S. App. 432, 14 C. C. A. 116, 66 Fed. 809; Barrow v. Turnpike Co., 9 Humph. 303; Bank v. Matthews, 98 U. S. 621; Cowell v. Springs Co., 100 U. S. 56; Fritts v. Palmer, 132 U. S. 282–289, 10 Sup. Ct. 93.

That the Nashville, Chattanooga & St. Louis Railway Company did not exceed its corporate powers in accepting this lease we have no doubt. The power existed under section 1122 of the Code of Tennessee as amended by the subsequent Acts 1871, c. 69; Acts 1881, c. 9; Acts 1887, c. 198; and Acts 1891, c. 61.

That this line of leased railroad, whether considered as one or two railroads, was not a parallel or competing line with the line of the lessee company, is most manifest from an examination of any railway map. Whether the termini of the leased line be regarded as Memphis and Lexington, Tenn., or Memphis and Paducah, it has no termini in common with the Nashville, Chattanooga & St. Louis Railway Company. No possible competition existed between the leased line and the main stem of the Nashville, Chattanooga & St. Louis Railway, which runs in a southeasterly direction from Nashville to Chattanooga. The St. Louis Division is said to be the division which was a parallel and competing line with the leased line. But a glance at the map filed as an exhibit, in connection with the averments of the bill, shows that this division runs from Hickman, Ky., on the Mississippi river, in a southeasterly direction, to Nashville. The leased line begins at Paducah, Ky., on the

Ohio river, and runs southeasterly to Hollow Rock, where it crosses the St. Louis Division of the Nashville, Chattanooga & St. Louis Railway; thence, in a southwesterly direction, to Memphis. The lines cannot be regarded as in any sense parallel lines, and there was no competition possible between them save for the comparatively short distance between Hollow Rock and McKenzie for business originating east of Hollow Rock, and billed to Memphis or points beyond, and which might have been carried to McKenzie for shipment to Memphis over the Memphis Division of the Louisville & Nashville Railroad. The mere intersection with another line, which might on occasion shorten a haul reached by a slightly more distant intersecting line, is not the sort of competition which concerns the public. We agree with District Judge Clark, who on this aspect of the bill said:

"Looking to the territory occupied by these lines of railway, taken as a whole, and the commerce which would naturally flow over the lines as originally constructed, whether this commerce be regarded as through shipments or local traffic, the lines are in no sense competitive. · If the fact that, by intersection with another line, they may in that way to an extent compete for such business as is incidentally furnished by intersecting lines, renders them competitive, it would virtually result that all lines of railway in the country would be competitive in a legal sense, while they would not be so according to a common understanding nor in the sense of commerce."

But was this contract within the corporate powers of the Louisville & Nashville Railroad Company? Could that company become the lessor of these roads? This is the most serious question arising on this record. The Tennessee Midland was a Tennessee corporation, and its line was wholly within Tennessee. The Paducah, Tennessee & Alabama was an incorporation of both Tennessee and Kentucky, and its line lay partly in one state and partly in another. Acts 1881, c. 9, as amended by Acts 1887, c. 198, and Acts 1891, c. 61, would, as we have already seen, have authorized the Nashville, Chattanooga & St. Louis Railway Company to have become the lessee of either or both of those roads, and would have authorized either or both to have become lessors to that company. Thus, the three companies had ample power to have made a lease such as that in question here. For the appellee it has been very earnestly urged that we need go no further; that whatever the old mortgagor companies could have lawfully done in respect to a disposition of these roads by lease may be lawfully done by any purchaser under judicial sale by virtue of section 2 of chapter 12 of the Acts of 1877, being section 1514 of the Revision of the Code and Statutes of Tennessee by Shannon. That section is in these words:

"Sec. 2. Be it further enacted, that in case of any railroad company chartered by this state or other state, and whose road lies in part or in whole in this state, which has heretofore mortgaged its franchises, roadbeds, superstructures, and property of every description, as provided or allowed in the acts of this state (Acts 1870-71, c. 116, passed February 2, 1871), or other law or laws, and said mortgage shall afterward be foreclosed in any court of this or of the United States having jurisdiction thereof, by sale under said mortgage, then and in that case the purchasers at said sale shall, by virtue thereof, be entitled to and be invested with the said franchises and property, and with all the rights, privileges and immunities appertaining thereto by the laws of this state, in the act of incorporation of said company, and the amendments thereto, and the general internal improvement law, or other laws of this state, in as full a manner as the said company or companies are or

were; provided, that nothing herein contained shall be so construed as to exempt said railroad and its property from liability to state, county and municipal taxation; and, provided, further, that the purchasers waive any right of exemption from taxation, if any existed in the original charter, or other law of this state, in favor of such railroad property, or stock therein."

The other sections of this chapter provide a mode by which the purchaser or purchasers of such foreclosed railroad may organize themselves into a corporation, with all the powers and rights possessed under the laws of the state by the railroads whose property has been thus acquired. It is clear that until such reorganization the purchaser, though clothed with all the franchises and rights of the foreclosed mortgagor, would not be an incorporation and could not exercise purely corporate powers. The case of Water Co. v. Magens, 15 Lea, 37, is an instructive case upon this point. The Memphis Water Company was a corporation organized for the purpose of constructing and operating waterworks. Its incorporation was under a special act granted by the Tennessee act of February 28, 1870. This charter gave it power to make a mortgage to secure an issue of bonds, and provided that, in the event of foreclosure, the purchaser should be "vested with all the powers and privileges, and be subject to all the duties and liabilities, of said company." At a foreclosure sale under judicial decree the property was purchased by Lathem and three associates, and title to all the property, franchises, and privileges of the mortgagor company was vested in them. These purchasers conceived themselves to be vested with corporate power, and to have the right to reorganize as the old company and under the old corporate name. Creditors of the old company undertook to subject the property thus acquired to the payment of their debts. An injunction bill was filed to restrain them, and the court held (1) that the purchasers were not a corporation, and had not acquired by virtue of the foreclosure sale any corporate capacity; (2) that the plain meaning of the provision in the charter concerning the rights of a purchaser at foreclosure sale was that, "under the sale of the property and franchises of the corporation, the purchasers are clothed with the powers and privileges of the charter for the purposes specified therein," and were equally subject to all the duties, burdens, and obligations imposed by the charter; (3) that the property thus acquired was not liable to the unpaid debts of the old corporation. This case is in strict accord with Memphis & L. R. R. Co. v. Railroad Com'rs, 112 U. S. 610, 5 Sup. Ct. 299. The plain effect of section 2 of this act of 1877 was to hold out, to any purchaser at judicial sale of a railroad under a mortgage covering both its franchises and property, the inducement of thereby becoming "invested with the said franchises and property, and with all the rights, privileges, and immunities, appertaining thereto by the laws of this state," as contained in the act of incorporation "or other law of the state regulating the powers and privileges of the foreclosed company." This would authorize the purchaser to operate such road and take tolls therefor, to mortgage, or sell, or lease the property, and in all respects to exercise all the rights and powers of the mortgagor corporation under the old charter or other law of the state, in

as full and complete a manner as the mortgagor company might have done. These powers did not, however, include the power of being a corporation or exercising such franchises and privileges as a corporation. Whatever duties and obligations had been imposed upon the old company as a Tennessee corporation were equally imposed upon the purchaser, whether that purchaser was an individual or a corporation. Whatever the old company could lawfully do, that the purchaser might do, if the existence of strictly corporate capacity was nonessential. If the purchaser desired to exercise these acquired franchises, and operate the purchased property as a corporation, he might do so by organizing under the provisions of this law or otherwise obtaining strictly corporate capacity. The legislature evidently intended to continue to any purchaser of such a foreclosed railroad all the powers and rights and franchises which had been conferred upon the old company, either under its charter or any law of the state affecting the powers and rights of such company. On the same day that this chapter 12 of the Acts of 1877 was passed, another act was passed, being chapter 20 of the Acts of 1877. This latter act authorized any railroad corporation "whose corporate existence had been recognized by any act of the legislature of this state" to become the purchaser of any railroad sold under judicial proceeding, "or sold by any person or persons, natural or corporate, who may have purchased or derived title under or from any such judicial sale." Construing these two acts together, it clearly follows that, if any railroad corporation coming within the description of the latter act should become the purchaser of any such foreclosed railroad, such purchaser would acquire the property and franchises, with all the rights, powers, and privileges conferred by section 2 of the act of 1877. The capacity to become lessor—the power by contract to devolve upon another corporation of the state the duty and privilege of operating these railroads as lessee—was a power which either or both of these companies might have exercised by virtue of the legislation existing at the date of the foreclosure sale of these leased railroads; that is, the law of the state permitted any corporation existing under the law of Tennessee, or under the law of Tennessee and some other state, to become either lessor or lessee of any railroad, in this or any other state, subject only to the possible exception that the leased line should not be a parallel or competing line to that of the lessor. This was the law when Phillips bought these roads and when he conveyed them to the Louisville & Nashville Railroad Company. He might have operated them himself or have leased them to another. He might sell them to any purchaser competent to buy. The Louisville & Nashville Railroad Company, as a corporation "whose corporate existence had been recognized by the legislature of this state," was competent to become a purchaser from him under chapter 20, Acts 1877; and under section 2, c. 12, Acts 1877, such a purchaser might operate or dispose of such roads, by lease or otherwise, in the same manner, and to the same extent, that the old corporations might have done. This purchaser was already a corporation. It had

capacity to be and exist as a corporation. But the powers and franchises, rights, duties, and obligations which rested upon the old foreclosed corporations furnished the measure of its powers, rights, duties, and privileges in respect of these roads thus purchased through judicial sale. Whatever burdens were imposed by their organic law, or by the law of the state, affecting their operation or powers, passed with the property to the purchaser, and along with these burdens went the franchises and rights and powers conferred by the same law. When we inquire as to the powers of the Louisville & Nashville Railroad Company as to these purchased roads, we must look to the law of their original organization and the law of Tennessee affecting such corporations.

The decree dismissing this bill must be reversed, and the cause remanded, with directions to overrule the 1st, 2d, 3d, and 7th demurrers filed by the Louisville & Nashville Railroad Company; and to sustain the 4th, 5th, 6th, and 8th grounds of demurrer filed by said company; and to dismiss so much of said bill as seeks relief upon the grounds covered by said special grounds of demurrer; and to overrule the 1st, 2d, 3d, and 9th demurrers filed by the Nashville, Chattanooga & St. Louis Railway Company; and to sustain the 4th, 5th, 6th, 7th, and 8th demurrers filed by said appellee; and dismiss so much of said bill as seeks relief upon the matters covered by said grounds of demurrer; and with directions to proceed with the cause consistently with the opinion of this court.

## On Petition for Rehearing.

### (December 19, 1898.)

The court has been asked to grant a rehearing in so far as under its opinion it is decided that under the statutes of Tennessee the Nashville, Chattanooga & St. Louis Railway Company could not enter into a valid contract of lease without the consent of three-fourths of its capital stock present and voting. A reconsideration of this matter is sought, first, upon the contention that section 1273 of the Tennessee Code should be regarded as "a particular act referring to the leasing by railroad companies of lines connecting with them," and that the act of 1881, c. 9, is a general act, and not to be construed as repealing a "particular act" applicable only to a special class of objects, or to a "special subject," there being no reference in the general act to the former "particular act." For this doctrine reference is made to Sedg. St. Law (2d Ed.) 97; Suth. St. Const. §§ 157, 158; Ex parte Crow Dog, 109 U. S. 556, 3 Sup. Ct. 396. This principle is thus stated by Mr. Sutherland:

"The purpose of a general act relative to a given subject may harmonize with a different purpose on that subject in a particular locality, or under special conditions, or as it affects a particular interest or a particular person or class; it may harmonize in the sense that both purposes may be effectuated. The purpose of the general law may be carried out, except as to the particulars in which a different intention is manifested. It is a principle that a general statute without negative words will not repeal by implication, from their repugnancy, the provisions of a former one which is special or local, unless there is something in the general law, or in the course of legislation upon its

subject-matter, that makes it manifest that the legislature contemplated and intended a repeal. When the legislator frames a statute in general terms, or treats a subject in a general manner, it is not reasonable to suppose that he intends to abrogate particular legislation, to the details of which he had previously given his attention, applicable only to a part of the same subject, unless the general act shows a plain intention to do so."

This principle is not applicable here. Section 1273 can in no sense be regarded as a "special" or "particular" act. It applied to all railroad companies owning "any main line," and gave to all such companies the power to contract with "any company owning a railroad connecting with such main line, for the lease thereof." It operates to grant a power not possessed by railway companies at common law, and so wide as to embrace the power of leasing any railroad which was not one entirely disconnected with that of the lessor company. The former law (Act 1857, c. 8) had expressly authorized such contracts upon terms agreed upon "between the president and directors" of the contracting companies. The code provision operated to repeal this act of 1857, but provided no method by which such lease might be made; thereby compelling a resort to common law for the determination of the question as to whether contracts of lease might be entered upon without the consent of the shareholders. The act of 1881, c. 9, covered the whole subject embraced by section 1273. It grants a power broader than that found in the old law, in that there is no limitation to "connecting railroads," but couples with this grant of power the important proviso that such contract should be approved by three-fourths in amount of the entire capital stock. This regulation of the manner in which such contracts might be entered upon, being made by an exception or proviso, operates as a prohibition upon the making of any contract embraced within the act, except in the manner and under the provisions of the act. The same act also confers the power of leasing out, and of selling or buying, and requires that all such contracts shall be submitted to the shareholders for their approval. The power of leasing out a railroad, or acquiring another by lease, is one which very vitally affects the contract between shareholders. That every such contract should be referred to the shareholders is, therefore, most reasonable; and it should not be lightly presumed that the law-making power would, when dealing with the general subject, intend to provide that some contracts of this character should be submitted to the shareholders for their approval, while others just as vital might be made without their consent.

It is said that the act of 1881, c. 9, is not a "negative," but an "affirmative" statute, and that, therefore, it should be construed as an act extending the power of leasing to the cases not provided for by the older law. If the older law was in fact a "special law" or a "particular act," there might be some reason for applying this technical rule of construction. All rules for the construction of statutes have but one end,—the ascertainment of the true intent and meaning of the act in question. In Mayor of London v. Reg., 13 Q. B. 33, Alderson, B., said that:

"The words 'negative' and 'affirmative' statutes mean nothing. The question is whether they are repugnant or not to that which before existed. That may more easily be shown when the statute is negative than when it is affirmative, but the question is the same."

The repugnancy between the old and the new law lies in the fact that the new law provides that such contracts shall be submitted to the shareholders for approval or rejection, while the old law was silent as to the power of the shareholders over the subject.    Undoubtedly the general rule is that, when there are two acts upon the same subject, effect should be given to both, if possible.    This is impossible, if the two acts are repugnant in any of their provisions.    The new law must, therefore, operate as a repeal of the old law, without regard to a repealing clause, to the extent of the repugnancy.    Neither is it always essential that there shall be an express repugnancy between the new and old statutes.    If the latter law covers the whole field embraced by the earlier act, and includes any new legislation tending clearly to indicate that the new statute was intended to take the place of the first act, it will be treated as repealing by implication the older provisions upon the same subject.    It will not be presumed that the legislature intended two distinct enactments upon the same subject.    Suth. St. Const. §§ 154–156.    In U. S. v. Tynen, 11 Wall. 88, 92, Mr. Justice Field said:

"Where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act."

To the same effect are Pierpont v. Crouch, 10 Cal. 315; Schneider v. Staples, 66 Wis. 167, 28 N. W. 145; Com. v. Cooley, 10 Pick. 37; Druggists' Cases, 85 Tenn. 450, 3 S. W. 490; Poe v. State, 85 Tenn. 495, 3 S. W. 658.

The act of 1881, c. 9, is clearly a revisory act, and as such operates as a repeal of the former law included within the general subject.

Second, it is said that an act passed in 1891 (being chapter 125 of the Tennessee Acts for 1891) operates as a repeal of all former legislation upon the subject of leasing "branch" railroads, and confers the power to acquire such "branch" railroads without the approval or consent of the shareholders.    This act was passed at the same session of the same legislature which passed the act of 1891, c. 61, which has already been considered and construed as a re-enactment of the second section of chapter 9 of the act of 1881, in so far as that section provided for the acquirement by lease of connecting lines of railroad.    Chapter 125 makes no reference to chapter 61, and none to any previous legislation upon the same subject, and contains no repealing clause.    It is in these words:

"Section 1. Be it enacted by the general assembly of the state of Tennessee, that any and all railroad companies now or hereafter existing under the laws of this state, or of this state and any other state or states, whose charter of incorporation was or may be granted by this state, be, and they are hereby, authorized and empowered to acquire the line or lines of any other railroad company, either in this state, or any other state or states, which may connect with and form a part and parcels or branches or extensions, by purchase, lease or otherwise, and pay for the same by the issue of their own capital and bonds, or by guaranteeing those issued by the company whose line may be so acquired, purchased or leased; provided, however, that nothing in this act shall be construed so as to authorize the acquisition, in any way, by any corporation or company, of parallel or competing lines."

This act was not overlooked, though not referred to in the opinion of the court, as it perhaps should have been. It covers a more limited subject than the existing law, in that it empowers any of the companies chartered under the laws of Tennessee to acquire the line of any other railroad "which may connect with and form part or parcels or branches, * * *" and to pay for same by its own stock or bonds, or by "guaranteeing those issued by the company whose railroad may be so acquired." The power to guaranty the bonds of another railroad company conferred by section 2 of the act of 1881, c. 9, was limited to the bonds of a railroad "whose original charter of incorporation was granted by the state of Tennessee." This limitation is not found in the act of 1891, c. 125. Under the latter act, power is conferred to pay for railroads acquired by purchase or lease, provided the roads so acquired "connect with and form part and parcels or branches or extensions," and are not parallel or competing lines, by guarantying the bonds of the company whose railroad is so acquired without regard to whether the charter of the company, whose bonds are so acquired, was or was not a company whose original charter was granted by the state of Tennessee. This is the gist of the act of 1891, c. 125. It is not repugnant to any existing law, and both laws may be saved and given effect. It in no way regulates the mode in which the lease in question may be made. The mode in which the power of leasing may be exercised is pointed out by the act of 1881, c. 9, as revived by the act of 1891, c. 61. The new act contains nothing inconsistent therewith, and it should not be construed as intended to affect the positive provisions of the general law regulating the details of the exercise of the power. The question is much like that presented by the acts construed by the supreme court of Tennessee in Frazier v. Railway Co., 88 Tenn. 138, 12 S. W. 537. The application for a rehearing must be denied.